The TORRINGTON COMPANY and
Ingersoll–Rand Corporation,
Petitioners,

v.

Sharon STUTZMAN et
al., Respondents.

No. 99–0261.

Supreme Court of Texas.

Argued Jan. 19, 2000.

Decided Dec. 21, 2000.

Rehearing Overruled March 8, 2001.

William Powers, Jr., University of Texas School of Law, Austin, Roger Townsend, Richard P. Hogan, Jr., Hogan Dubose & Townsend, Jennifer Bruch Hogan, Hogan Dubose & Townsend, L.L.P., Kevin H. Dubose, David M. Gunn, Hogan Dubose & Townsend, Houston, William M. Tolin, III, Benckenstein & Oxford, Beaumont, David H. Brown, D. Ferguson McNiel, Vinson & Elkins, Houston, for petitioners.

King Waters, Waters & Waters, JoAnn Storey, Storey, Moore & McCally, Tracy J. Willi, Womble & Cotellesse, Houston, Justin Williams, Williams Kasperitis & Gowan, David J. Fisher, Orgain Bell & Tucker, Silsbee, Claudia Wilson Frost, Matthew P. Eastus, Slusser & Frost, L.L.P., Houston, Gilbert I. "Buddy" Low, Orgain, Bell &

Tucker, Beaumont, Ernest H. Cannon, Ernest H. Cannon & Associates, Houston, Finis E. Cowan, Jr., Dickinson, Joe E. Broussard, Mehaffy & Weber, Beaumont, for respondents.

Justice O'NEILL delivered the opinion of the court joined by Chief Justice PHILLIPS, Justice ENOCH, Justice BAKER, Justice ABBOTT, Justice HANKINSON, and Justice GONZALES.

This case arises out of a Navy helicopter crash that killed two Marines. A jury found that a defective bearing in the helicopter's tail rotor assembly caused the crash. The trial court rendered judgment for the plaintiffs against the bearing's manufacturer and the manufacturer's successor. We consider a number of issues, including (1) whether the plaintiffs' negligent undertaking claim against the successor corporation was properly submitted to the jury, (2) whether the successor is contractually obligated to indemnify the manufacturer, (3) whether legally sufficient evidence supports the judgment against the bearing's manufacturer, (4) whether the trial court erred in refusing to submit a jury question on the government-contractor defense, (5) whether the trial court applied the appropriate state's law governing damages, (6) whether the jury verdict may be vitiated based upon excessiveness, and (7) whether the successor waived its objection to the trial court's determining attorney *ad litem* fees without an evidentiary hearing.

We conclude that the broad-form negligence question the trial court submitted to the jury omitted elements necessary to impose liability upon the successor under a negligent undertaking theory. Accordingly, we reverse the judgment against the successor and remand the plaintiffs' claims against the successor to the trial court in the interest of justice. We further hold that the trial court did not err in enforcing the successor's contractual indemnity obligation, and that the successor has standing to challenge the judgment against the manufacturer. Additionally, we hold that legally sufficient evidence supports the judgment against the manufacturer. We also hold that the trial court did not err in refusing to submit the government-contractor defense to the jury, and that the trial court properly applied choice-of-law principles. Further, we hold that, on this record, we may not vitiate the jury verdict based upon excessiveness. Finally, we hold that the successor waived its claim that the trial court erred by determining *ad litem* fees without an evidentiary hearing. Accordingly, we affirm the judgment against the manufacturer. We also affirm that portion of the judgment against the successor based upon its contractual indemnity.

# I

## Background

On July 31, 1992, a Navy helicopter crashed, killing two Marines, Phillip D. Stutzman and James Pulaski. It is undisputed that the crash was caused by the failure of a bearing, although the parties dispute what caused the bearing to fail. The bearing was manufactured in 1984 by Fafnir Bearings, a division of Textron, Inc. Textron is also the parent company of Bell Helicopter Textron, Inc. (Bell), the company that manufactured the helicopter. Fafnir was purchased in 1985 by Torrington's parent corporation, Ingersoll–Rand Co., and became a division of Torrington. The purchase agreement requires Ingersoll–Rand to indemnify Textron for products liability claims based upon the bearing.[1]

1. The trial court rendered judgment against

Torrington and "Fafnir Bearing Company, a

Textron (and later Torrington) manufactured two types of bearings: (1) a nonregreasable—05 bearing used primarily in military helicopters designed and sold by Bell, and (2) a regreasable—03 bearing used in civilian helicopters. At the time the bearing involved in the crash was sold, both—03 and—05 bearings were manufactured at Textron's New Britain, Connecticut, plant. The bearing that failed was a—05 bearing. It was acquired by the Navy sometime in or before 1984, but was not placed in a helicopter until 1990. That helicopter flew for 444 hours. In 1992, the defective bearing was placed into the helicopter involved in this crash.

The—05 bearing is a sealed bearing; grease is injected into it when it is assembled, and the bearing is not designed to be greased again after that. Like other—05 bearings made by Textron at the time, the bearing that failed had no serial number.

The—05 bearing is part of the helicopter's hangar assembly, which is part of the drivetrain that turns the tail rotor. The bearing is composed of two rings, called the inner and outer races. Sealed in between the races are steel balls lubricated with grease.[2] The bearings support the shaft that drives the tail rotor; the shaft rests on the inner race, which turns with it.

After acquiring Textron's bearing manufacturing operation in 1985, Torrington sold—05 bearings directly to the military and to Bell. Bell installed some of the bearings in the helicopters it manufactured, and also resold some to the military. In 1988, Torrington moved its production of—03 and—05 bearings to a plant in Newington, Connecticut. Seeking Bell's approval for the move, Torrington represented that the Newington equipment, personnel, and processes were the same as or superior to those at its New Britain operation.

In 1991, a Bell civilian helicopter crashed. This incident is referred to in the record as "the Rood crash." An investigation of the Rood crash concluded that a—03 bearing in the helicopter's tail rotor had failed. After this accident, Bell, Torrington, and the FAA inspected the Newington plant. The inspection revealed a number of problems with the manufacturing process at the plant affecting both—03 and—05 bearings, including the lack of a shelf-life control policy for bearing grease and metal contamination of bearing components.

After the inspection, Bell pulled all of its—03 and—05 bearings from the shelves, and recalled those—03 and—05 bearings it had sold the military. Bell asked Torrington for the serial numbers of all—03 and—05 bearings to include in a warning bulletin to be issued to owners and operators of Bell helicopters. Torrington gave Bell the numbers for—03 and—05 bearings made at Newington and New Britain, but did not mention the unserialized bearings that Textron had made at New Britain. The Bell bulletin, referred to as an "Alert Service Bulletin," listed the serial numbers of some—03 and—05 bearings, but stated that bearings without serial numbers were

Division of Textron," despite the sale of Fafnir to Torrington. As we understand the record, the judgment against Fafnir as a Division of Textron is predicated on the jury's findings that the bearing was defectively designed, manufactured, and marketed, and the judgment against Torrington is based upon allegedly negligent acts by Torrington or Fafnir that occurred after the bearing was sold. The parties do not differentiate between Textron and "Fafnir Bearing Company, a Division of Textron." Accordingly, we will refer to the manufacturer of the bearing as Textron.

2. At trial, these steel balls were also sometimes referred to as "bearings." When we refer to the "bearing," we mean to indicate the entire assembled unit.

not affected. The bulletin directed mechanics to inspect the listed bearings for signs of overheating, grease leakage, or roughness.

After Bell issued its bulletin, Torrington's president wrote Bell, taking issue with the bulletin's reference to bearing contamination and advising that Torrington was "most anxious to participate in any evaluation you are currently performing." The letter also stated that Torrington intended to "continue to actively participate with the [National Transportation Safety Board] in their investigation [of the Rood crash and that] [w]e feel it is important to investigate all possible causes of the incident to assure the continued air worthiness of the Bell Helicopter."

The Navy issued its own bulletin in response to Bell's. This bulletin, known as a DCB–80, directed mechanics to "remove and replace" all bearings with the serial numbers listed in Bell's bulletin "not later than the next phase inspection." The DCB–80 also directed mechanics to "maintain vigilant normal required daily inspection" of bearings.

On March 12, 1992, some four months before this crash, a Navy mechanic inspected the helicopter involved in this suit. After the inspection, the mechanic filled out a maintenance service card. On the card, under the heading "discrepancy," the mechanic wrote, "Remove and Replace ... hangar bearing for compliance with DCB–80." Because the hangar bearing did not have a serial number, it was not listed on the DCB–80. Under the heading "corrective action," the mechanic wrote, "R and R'd ... hangar bearing for compliance with DCB–80 (not complied with)." The mechanic left the bearing in the helicopter.

The crash occurred on July 31, 1992. Upon initial inspection, the Navy thought the bearing had failed because its grease was too old. Later, after more testing, the Navy concluded that "the most likely cause of the failure was misalignment." The Navy JAG report concluded that the crash was caused by "misalignment and lubrication breakdown." The Navy's metallurgy lab wrote that the bearing failed because of overheating. The Navy lab concluded that "the cause of the overheating cannot be positively identified ... however, the spalling on the # 1 outer race indicated a misalignment." There is evidence in the record, however, indicating that contaminants in the grease caused the spalling.

After the crash, Stutzman's and Pulaski's survivors filed this wrongful death and survival suit against more than thirty corporate entities. Except for Torrington, Textron, Mobil, and Bell, all of the remaining defendants were either nonsuited or received directed verdicts. The plaintiffs asserted various products liability and negligence claims. Although the plaintiffs sued Bell and several related entities alleging that the helicopter was defective, at trial they focused on Textron's bearing as the cause of the crash.[3] The plaintiffs presented evidence that grease in a Textron tail rotor bearing degraded over time. They contended that the bearing was defectively designed and marketed because it had no serial number to facilitate an appropriate tracking system, and because Textron gave the Navy erroneous information about the grease's shelf-life. They also presented evidence that Textron's manufacturing processes allowed contaminants in the bearings. Torrington, as a third-party petitioner against Bell, presented evidence suggesting that the tail rotor assembly that housed the bearing was misaligned, which damaged the bearing and caused its failure.

---

3. The plaintiffs nonsuited Bell at one point, but they reasserted their claims against Bell after Torrington filed a third-party action against that company.

The jury found that the bearing was defectively designed, manufactured, and marketed, that Textron and Torrington were negligent, and that Bell was not. They apportioned one percent of the liability to Textron and ninety-nine percent to Torrington. The jury awarded actual damages totaling $35,765,000, which the trial court remitted to $29 million. They also found that Torrington was grossly negligent and awarded $50 million in exemplary damages, which the trial court remitted to $5 million. In a separate bench trial, the trial court found that Ingersoll–Rand, Torrington's parent, was required to indemnify Textron under the terms of its purchase agreement.

Torrington appealed; Textron did not.[4] The court of appeals, with Justice Burgess dissenting, found no evidence to support the gross negligence finding and reversed the exemplary damages award. *See* 46 S.W.3d at 852. The court affirmed the trial court's judgment in all other respects. *See id.* We affirm the court of appeals' judgment in part, and reverse and remand in part.

## II

### Torrington's Liability

#### A. Propriety of Jury Submission

Torrington argues that the judgment against it cannot stand because Texas does not recognize a post-sale duty to warn of product defects not discovered until after manufacture and sale. Torrington further argues that the court of appeals erred in holding that it owed the plaintiffs a duty under *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

In *Bradshaw*, the court of appeals held that a manufacturer who regained control of a product but failed to remedy a defect before it was resold could be liable in both strict liability and negligence. *Id.* at 531–32. In this case, the plaintiffs do not base Torrington's liability upon its status as the bearing's manufacturer or upon any control that it may have regained over the bearing. Instead, the plaintiffs contend that Torrington assumed a duty toward them by undertaking to investigate and identify defective bearings. Thus, we are not called upon to recognize any post-sale duty to warn, or to determine whether the control-based duty the *Bradshaw* court recognized applies.[5] And although the plaintiffs cite several other sections of the *Restatement of Torts: Products Liability*, including sections 10, 11, 12, and 13, they expressly disavow an intent to have this Court recognize any new duties, and merely argue that their undertaking theory comports with mainstream case law. Thus, we express no opinion whether those

---

4. The plaintiffs also appealed, arguing that the trial court improperly applied a factual sufficiency review in remitting actual damages. The court of appeals affirmed the remittitur, and the plaintiffs do not appeal that judgment.

5. In their initial brief on the merits, the plaintiffs relied upon *Bradshaw*'s holding that the defendant had negligently performed an undertaking, arguing that under this theory they were not required to prove that Torrington regained control over the bearing. In their post-submission brief, the plaintiffs argued for the first time that they are entitled to recover under *Bradshaw* regardless of whether they established the elements of a negligent undertaking. In *Bradshaw*, however, the manufacturer had regained control over the product before it was resold. There is no evidence here that Torrington regained possession or control of the failed bearing after it was sold to the Navy. Thus, *Bradshaw's* alternative holding does not apply. *See Dion v. Ford Motor Co.*, 804 S.W.2d 302, 311–12 (Tex. App.—Eastland 1991, writ denied).

*Restatement* sections are consistent with established Texas law. Instead, we will analyze Torrington's liability under the plaintiffs' undertaking theory.

In response to a broad-form negligence question, the jury found that Torrington's negligence proximately caused the crash. The court's charge defined the terms "negligence," "ordinary care," and "proximate cause," but provided no further instructions or definitions applicable to the negligence question.[6] Torrington contends that the jury's negligence finding cannot support the judgment against it because the charge omitted elements necessary to impose liability under the plaintiffs' undertaking theory. We agree.

■ To sustain their negligence claim, the plaintiffs were required to establish that Torrington violated a legal duty owed to them. *See Abalos v. Oil Dev. Co. of Texas,* 544 S.W.2d 627, 631 (Tex.1976). Texas law generally imposes no duty to take action to prevent harm to others absent certain special relationships or circumstances. *See SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 353 (Tex. 1995); *see also* RESTATEMENT (SECOND) OF TORTS § 314 (1965) ("The fact that [an] actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). As we recently explained:

There are many instances in which it may be said, as a matter of law, that there is a duty to do something, and in others it may be said, as a matter of law, that there is no such duty. Using familiar illustrations, it may be said generally, on the one hand, that if a party negligently creates a dangerous situation it then becomes his duty to do something about it to prevent injury to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby. On the other hand, it may be said generally, as a matter of law, that a mere bystander who did not create the dangerous situation is not required to become the good Samaritan and prevent injury to others.

*SmithKline Beecham,* 903 S.W.2d at 353 (quoting *Buchanan v. Rose,* 138 Tex. 390, 159 S.W.2d 109, 110 (1942)). In this case, the plaintiffs contend that Torrington assumed a duty toward them to investigate and identify potentially defective bearings.

■ While Texas law imposes no general duty to "become [a] good Samaritan," we have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation. *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 396 (Tex.1991); *Colonial Sav. Ass'n v. Taylor,* 544 S.W.2d 116, 120 (Tex.1976); RESTATEMENT (SECOND)

---

6. The negligence question asked: "Did the negligence, if any, of the parties named below proximately cause the occurrence in question?"

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. "Ordinary care" means that degree of care that would be used by a person of ordinary

prudence under the same or similar circumstances.

"Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

OF TORTS §§ 323, 324A (1965). In *Colonial Savings*, 544 S.W.2d at 119–20, we relied upon section 323 of the *Restatement*, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 323 (1965).[7] The plaintiffs contend that Torrington assumed a duty toward them under the *Restatement* and *Colonial Savings*. They further contend that the broad-form negligence question they submitted was sufficient to support the judgment against Torrington.

In an analogous context, we have rejected the argument that a broad-form negligence question, without more, can support a judgment against a possessor of land. *See Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex.1997). In *Olivo*, we held that a broad-form negligence question that omitted instructions about the knowledge and risk-of-harm elements of a premises liability claim was insufficient. *Id.* Premises liability cases are similar to undertaking cases in that the plaintiff seeks to impose a duty on another to take protective action based upon special circumstances or the relationship between the parties. *See* RESTATEMENT (SECOND) OF TORTS Scope Note, Topic 7 (1965) (comparing duties of affirmative action described in Topic 7 with duties imposed upon possessors of land). In premises liability cases, like undertaking cases, a possessor of land may be held liable only if certain conditions are met. *See* RESTATEMENT (SECOND) OF TORTS §§ 342, 343 (1965) (describing, respectively, conditions upon which land possessors may be held liable to licensees and invitees).

█ Here, the broad-form negligence question allowed the jury to hold Torrington liable regardless of whether Torrington knew or should have known that its services were necessary to protect others. *Cf. Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex.1994). The question also allowed an affirmative answer regardless of whether anyone relied upon Torrington's undertaking, or whether Torrington's performance of its undertaking increased the plaintiffs' risk of harm. Because the question allowed the jury to find Torrington liable even if the plaintiffs did not establish the necessary factual predicates for a negligent undertaking duty, it was erroneous. *See id.* These essential elements of an undertaking claim should be included in the instructions accompanying a broad-form negligence question. *Cf. Keetch v. Kroger Co.*, 845 S.W.2d 262, 267 (Tex.1992). Thus, the jury should have been instructed that Torrington was negligent only if (1) Torrington undertook to perform services that it knew or should have known were necessary for the plaintiffs' protection, (2) Torrington failed to exercise reasonable care in performing those services, and either (3) the Navy relied upon Torrington's performance, or (4) Torrington's performance increased the plaintiffs' risk of harm. *See Colonial Sav-*

---

7. We have never held that a person may be liable on an undertaking theory without establishing reliance or increased risk of harm, and we decline to do so now. To the extent *Brad-* *shaw* recognized liability under an undertaking theory without proof of reliance or increased risk of harm, we disapprove it.

*ings,* 544 S.W.2d at 119–20; RESTATEMENT (SECOND) OF TORTS § 323 (1965).[8]

■ Furthermore, while the record contains some evidence that Torrington engaged in an undertaking, the scope of the undertaking is unclear. In a letter to Bell Helicopter's president, Torrington represented that it was investigating the cause of the Rood crash "to assure the continued air worthiness of the Bell Helicopters." Because the helicopter involved in the Rood crash was a civilian helicopter that used a—03 bearing, Torrington interprets this letter to establish, at most, an undertaking to identify defective—03 bearings manufactured after Torrington acquired Fafnir. On the other hand, the plaintiffs contend that Torrington assumed a broader undertaking to investigate and identify all potentially defective bearings, an interpretation supported to some extent by the fact that Torrington ultimately gave Textron a list of serial numbers for both—03 and—05 bearings, some of which were manufactured at the New Britain plant. In *Sbrusch,* we observed that "[a] person's duty to exercise reasonable care in performing a voluntarily assumed undertaking is limited to that undertaking." *Sbrusch,* 818 S.W.2d at 397. When, as here, the facts about the scope of the assumed duty are in dispute, the jury should be instructed to that effect.

## B. Effect of Erroneous Submission

■ Because the broad-form negligence question omitted elements necessary to establish an undertaking claim, it was erroneous. We must now decide whether that error requires us to render judgment or remand the case to the trial court for a new trial.

Our disposition of charge-error cases in recent years has been less than clear. *See, e.g., State v. San Miguel,* 981 S.W.2d 342, 352–53 (Tex.App.—Houston [14th Dist.] 1998) (Edelman, J., dissenting), *rev'd on other grounds,* 2 S.W.3d 249 (Tex. 1999); Edwin J. Terry et al., *Trends in Preservation of Error (at Trial, Charge, and Post Verdict),* in State Bar of Tex.Prof.Dev.Program, Advanced Civil Appellate Practice Course E, E–41 (1999). In *Olivo,* we rendered judgment when a broad-form negligence question was submitted without appropriate instructions on the premises liability factors we identified in *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 296 (Tex.1983). *Olivo,* 952 S.W.2d at 530. But in *Spencer,* we remanded for a new trial when the trial court submitted a liability question to the jury without necessary instructions. 876 S.W.2d at 158. There, we explained that rendition is appropriate only when the question submitted is immaterial. *Id.* at 157. We concluded that the question in *Spencer* was not immaterial because it "plainly attempted to request a finding on a statutory cause of action." *Id.* Our rendition in *Olivo* did not discuss whether the omitted instructions made the question immaterial or merely defective. Nevertheless, by our disposition of the case we implicitly concluded that the defectively submitted question was immaterial. In a number of cases since *Spencer,* we have remanded for a new trial after concluding that the charge error did not make the question submitted immaterial. *See, e.g., Borneman v. Steak & Ale of Texas, Inc.,*

8. We note that Torrington objected to the negligence question on the basis that it owed the plaintiffs no duty. Until our opinion today, it was not clear whether or how the factual predicates for an undertaking duty should be submitted. Under these circumstances, Torrington's no-duty objection was sufficient to preserve error and to prevent deemed findings against it. *See State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992).

22 S.W.3d 411, 413 (Tex.2000) (holding that remand was proper when plaintiff plainly attempted to request a finding on a statutory cause of action); *Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex.1999) (remanding when question failed to confine jury to drainage that occurred before units in an oilfield were pooled); *but see Dallas Mkt. Ctr. Dev. Co. v. Liedeker*, 958 S.W.2d 382 (Tex.1997) (per curiam) (remanding defectively submitted premises-liability case without discussing question's materiality).

In the cases in which we have concluded that a question was merely defective, as opposed to immaterial, the question at issue attempted to submit a theory to the jury that did not require the determination of predicate facts to establish a legal duty, and thus attempted to submit a controlling issue, albeit defectively. *See, e.g., Borneman*, 22 S.W.3d at 413; *Tichacek*, 997 S.W.2d at 171–72. But in *Olivo*, the defendant owed no duty toward the plaintiff unless specific factual predicates were established. Without any determination that the specific factual predicates were met, the question did not submit a controlling issue. In other words, absent any determination that the factual predicates giving rise to a legal duty were satisfied, the defendants' failure to use reasonable care was of no legal consequence.[9] *See Triplex*

*Communications, Inc. v. Riley*, 900 S.W.2d 716, 720 (Tex.1995).

In this case, Torrington owed no legal duty toward the plaintiffs absent the factual predicates we have discussed. Without a determination of these predicate duty elements, Torrington's failure to use ordinary care is immaterial and rendition would normally be proper. Nevertheless, our rules allow us to remand in the interest of justice when appropriate, even if rendition would ordinarily be warranted. *See* TEX.R.APP.P. 60.3. We did not do so in *Olivo*, because the distinction between premises liability claims and negligent activity cases, and the requirement that the *Corbin* elements be submitted in premises liability cases, were well established by the time the case was decided. *See Olivo*, 952 S.W.2d at 530 (Spector, J., dissenting); *Keetch v. Kroger Co.*, 845 S.W.2d 262 (Tex. 1992). But we have remanded in the interest of justice when our decisions have altered or clarified the way in which a claim should be submitted to the jury. *See, e.g., L.M.B. Corp. v. Gurecky*, 501 S.W.2d 300, 303 (Tex.1973); *Scott v. Liebman*, 404 S.W.2d 288, 294 (Tex.1966).

We have never considered how an undertaking claim should be submitted to the jury, nor had the courts of appeals directly addressed the issue at the time this case was tried. *Cf. Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 26 (Tex.1994) (re-

---

9. In a per curiam opinion issued some months after *Olivo*, we remanded a case in which the jury charge was defective. *Dallas Mkt. Ctr. Dev. Co. v. Liedeker*, 958 S.W.2d 382, 386 (Tex.1997). The principal issue we considered was whether a jury charge that imposed a higher than ordinary duty of care upon a hotel for operation of an elevator was erroneous. *Id.* at 384–85. We concluded that it was, and remanded to the trial court for a new trial. *Id.* at 385. In doing so, we also addressed another issue raised by the hotel "to provide guidance to the district court on remand." *Id.* We noted that the

charge incorrectly omitted inquiry on an element of premises liability. *See id.* at 385–86. That portion of the opinion intended to provide guidance to the trial court on remand was, technically, judicial dictum. *See id.* (citing *Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 81 (Tex.1997) (citing *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764, 773 (Tex.1964) and *Parker v. Bailey*, 15 S.W.2d 1033, 1035 (Tex.Comm'n App.1929, holding approved))). To the extent that *Dallas Market Center* is inconsistent with *Olivo*, we overrule it.

manding in the interest of justice when trial had been conducted before any opinion of the Court had specifically addressed the standards governing the imposition of punitive damages in bad faith cases). Until our opinion today, no appellate decision has discussed whether the factual predicates giving rise to an undertaking claim should be submitted to a jury or decided by the court as a question of law. *Colonial Savings* was decided under this state's former special issues practice, and thus did not address whether a broad-form negligence question would support recovery on a negligent undertaking theory. *See* 544 S.W.2d at 118. And since *Colonial Savings* was decided, only one appellate decision has discussed the submission of an undertaking case. In that case, the parents of a boy injured while driving a four-wheeler sued the vehicle's owners alleging, among other things, that they were negligent in allowing the boy to ride without providing him a helmet or adequate safety instruction. *See Park v. Larison*, 28 S.W.3d 106, 113 (Tex.App.—Texarkana 2000, no pet.). The court of appeals held that the trial court did not abuse its discretion in refusing to instruct the jury on the factual predicates necessary to an undertaking claim. *Id.* The court reasoned:

> The instruction requested by the Parks is a correct statement of Texas law, in accordance with the Texas Supreme Court's holding in *Colonial Savings Association v. Taylor* .... The instruction requested by the Parks discusses the extent of one's legal duty to render services to protect another's person or property. Duty is an issue of law for the court; not the jury. As such, the

requested instruction was not necessary to enable the jury to render a verdict. *Id.* (citations omitted).[10] To the extent that *Park* suggests that the factual predicates for an undertaking duty are to be decided by the court, we disapprove it. In any event, *Park* demonstrates that the law regarding the submission of these types of claims has remained unclear.

Because neither this Court nor any other appellate court had written about the proper submission of an undertaking claim at the time this case was tried, it is appropriate to remand this case in the interest of justice. Accordingly, we reverse the court of appeals' judgment and remand the plaintiffs' negligent undertaking claim against Torrington to the trial court. *Cf. Wilson v. Texas Parks & Wildlife Dep't*, 8 S.W.3d 634, 635–36 (Tex.1999) (denying petition for review when court of appeals remanded in the interest of justice claim that would properly be presented as undertaking claim). We next consider Torrington's liability as Textron's indemnitor.

### III

### Indemnity

■ The trial court ruled that Torrington is contractually obligated to indemnify Textron, and the court of appeals agreed. 46 S.W.3d at 852. Torrington argues that Textron's collusion in procuring a judgment against itself voids Torrington's indemnity obligation.

■ Textron's indemnity claim is based upon Torrington's contract to purchase Fafnir. That contract provides that Torrington will indemnify Textron for various types of claims against Fafnir, including

---

**10.** At least one commentator has noted a wide split in authority about whether fact questions that form the predicate for a duty should be decided by the court or the jury. *See* William Powers, Jr., *Judge & Jury in the Texas Su-*

*preme Court*, 75 Tex.L.Rev. 1699, 1715–16 (1997) ("[I]f a particularized duty rule raises fact questions about its application, who decides these predicate fact questions?").

products liability claims. It also provides that New York law will govern the agreement. Under New York law, an indemnitee's fraud or collusion in obtaining a judgment against itself voids its indemnity rights. *See Conner v. Reeves*, 103 N.Y. 527, 9 N.E. 439, 440–41 (N.Y.1886). Torrington points to several matters that occurred during the trial to establish Textron's collusion.

First, Torrington points to evidence suggesting that Textron collaborated with the plaintiffs and Mobil in exercising jury strikes: the plaintiffs struck only jurors between one and nineteen and juror number thirty, while Textron struck only jurors between twenty and twenty-nine, and Mobil struck only jurors above thirty-one. Torrington also points to the plaintiffs' exclusive focus on the bearing, rather than the helicopter, in opening and closing arguments and in presenting evidence. It also points to the plaintiffs' reliance upon Textron's experts and interrogatory responses, all of which were critical of the bearing. Finally, Torrington points to the fact that Textron specifically suggested in its closing argument that the jurors should answer "yes" to questions about defects in the bearing's design, manufacture, and marketing.

■ The trial court made no express findings of fact in connection with its judgment awarding Textron indemnity, and Torrington requested none. When no findings of fact and conclusions of law are filed, the trial court's judgment implies all necessary supporting fact findings. *See Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 276 (Tex.1979). Accordingly, unless Torrington conclusively

proved collusion, the trial court's judgment must stand. *See Wisdom v. Smith*, 146 Tex. 420, 209 S.W.2d 164, 166–67 (1948).

Undoubtedly, Textron adopted a position at trial adverse to Torrington by attacking the bearing. To a large extent, however, Torrington forced it to do so, first, by denying Textron's request for a defense, and then by asserting a third-party claim against Textron's subsidiary, Bell, the helicopter's designer and manufacturer, after the plaintiffs had nonsuited that company.[11] At trial, Torrington attempted to place responsibility for the crash on Bell by presenting evidence that the helicopter was defectively designed. Thus, Textron was forced to choose between defending the bearing or defending the helicopter. That Textron elected a trial strategy adverse to Torrington does not conclusively establish that Textron colluded with the plaintiffs. And while the absence of duplicate jury strikes may be suggestive, it is not conclusive.

Moreover, other evidence shows that Textron did take steps that were adverse to the plaintiffs. For example, Textron removed the case to federal court, thus contesting the plaintiffs' chosen forum. The plaintiffs also reasserted their claims against Textron's subsidiary, Bell, once Torrington filed its third-party action. In addition, Textron supported Torrington's objections to parts of a deposition the plaintiffs proffered, and also joined some of Torrington's no-evidence objections to submitting an issue on Textron's negligence.

Finally, Textron's counsel specifically testified that there was no deal, settlement, or agreement with the plaintiffs.

---

11. Textron opposed Torrington's motion for leave to file the third-party claim. But Torrington argued that Bell was "the designer and manufacturer of the UH–1n helicopter," and argued that "[t]he issues in this suit are

... much broader in scope [than the manufacture, sale, or distribution of the bearing] and involve issues relating to the design of the entire tail rotor drive shaft system as well as the crash worthiness of the helicopter."

And, although the plaintiffs relied heavily upon Textron's expert, Roy Battles, to establish that the bearing was defective, Battles testified that he had not spoken to the plaintiffs' counsel other than in depositions. On this record, we cannot conclude that Torrington conclusively established that Textron colluded with the plaintiffs in obtaining a judgment against itself.[12]

We now consider whether Torrington, by its indemnity obligation, has standing to challenge the judgment against Textron.

### IV

### Torrington's Standing to Appeal the Textron Judgment

■ Textron, Torrington's indemnitee, chose not to appeal the trial court's judgment. The plaintiffs contend that Torrington has no standing to appeal the judgment against Textron. We disagree.

■ Texas courts have long held that an appealing party may not complain of errors that do not injuriously affect it or that merely affect the rights of others. *See Texas Workers' Compensation Ins. Fund v. Mandlbauer*, 988 S.W.2d 750, 752 (Tex.1999); *Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 150 (Tex.1982); *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 92 (Tex.1973); *Shell Petroleum Corp. v. Grays*, 131 Tex. 515, 114 S.W.2d 869, 870 (1938). The converse proposition, however, is also true: a party whose own interest is prejudiced by an error has standing to appeal. *See Jernigan v. Jernigan*, 677 S.W.2d 137, 140 (Tex.App.—Dallas 1984, no writ) (holding nonparty bound by judgment was entitled to appeal); *see also Gorman v. Gorman*, 966 S.W.2d 858, 864 (Tex.App.—Houston [1st Dist.] 1998, pet. denied). Several cases are cited to

support the plaintiffs' argument that Torrington may not challenge the judgment against Textron, including *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442 (Tex. 1989), *Shank, Irwin, Conant & Williamson v. Durant, Mankoff, Davis, Wolens & Francis*, 748 S.W.2d 494 (Tex.App.—Dallas 1988, no writ), and *CNL Fin. Corp. v. Hewlett*, 539 S.W.2d 176 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.). But these cases are not on point.

■ In *Plas–Tex*, we held that reversing a judgment against one defendant does not require reversing a take-nothing judgment for a nonappealing co-defendant unless the rights of the appealing and nonappealing parties are so interwoven or dependent on each other as to require a reversal of the entire judgment. *Plas–Tex*, 772 S.W.2d at 446. If the parties' rights are so interwoven, we reverse the unappealed judgment to remedy the effects of the erroneous judgment that prejudiced the appealing party's rights. *Id.* (citing *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 166 (Tex.1982)). In *Plas–Tex*, we did not reverse the judgment against the nonappealing party because we could effectively remedy the erroneous judgment against the appealing party without doing so. *See id.*

Torrington does not argue that we should reverse the judgment against Textron to remedy error in the plaintiffs' judgment against Torrington. Rather, Torrington argues that, whether or not the judgment against it is reversed, it has standing to appeal the judgment against Textron because it must pay that judgment. Thus, *Plas–Tex* does not control this case. Similarly, *Shank* and *Hewlett*

---

12. We note that Torrington did not object to the directed verdict in Mobil's favor, except to the extent Mobil is implicated in its collusion arguments. Because we hold that Torrington failed to conclusively demonstrate collusion, the judgment in Mobil's favor is final.

do not apply. *See Shank,* 748 S.W.2d at 500–501 (discussing a third party's ability to raise contract defenses at trial, and not one party's standing to appeal a judgment against another party); *Hewlett,* 539 S.W.2d at 177 (holding that one party is not entitled to reverse a judgment against it simply because there was an error leading to judgment against another party).

We faced a situation similar to Torrington's in *Bi–Ed, Ltd. v. Ramsey,* 935 S.W.2d 122 (Tex.1996). Bi–Ed's predecessor-in-interest sued for access to land, arguing that the disputed property belonged to the city and not Ramsey. *Id.* at 123. The city was joined as a party. *Id.* The trial court found that the land belonged to Ramsey and rendered judgment accordingly. *Id.* The city did not appeal. We held that Bi–Ed could appeal despite the fact that it asserted no ownership interest in the property, reasoning that it had a "justiciable interest" in pursuing the case. *Id.* at 124. Similarly, Torrington has a clear justiciable interest in appealing the judgment against Textron, which it would have to pay. This is in accord with our well-established rule that, to appeal an alleged error, a party must show that the error injuriously affects it. *See, e.g., Shell Petroleum Corp. v. Grays,* 131 Tex. 515, 114 S.W.2d 869, 870 (1938). Because we uphold the trial court's judgment requiring Torrington to indemnify Textron, Torrington would be injured by any error in the judgment against Textron. Accordingly, we hold that Torrington may challenge that judgment. We now consider whether there is legally sufficient evidence to support the judgment against Textron.

## V

### No–Evidence Review

■ Torrington contends that the strict liability finding against Textron cannot stand because there is no evidence that the Textron bearing was defective when it was placed into the stream of commerce. We will sustain Torrington's no-evidence point only if no more than a scintilla of evidence supports the verdict. *See General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999). The jury found that the bearing had design, manufacturing, and marketing defects when it left Textron's possession. If some evidence supports any one of these findings, we must sustain the verdict against Textron.

■ To recover in strict liability for a manufacturing defect, the plaintiffs had to show that the bearing was defective when Textron sold it, and that the defect was a producing cause of the plaintiffs' injuries. *See Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 335 (Tex. 1998); *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995). A product has a manufacturing defect if its construction or quality deviates from the specifications or planned output in a way that is unreasonably dangerous. *American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 434 (Tex. 1997). The plaintiffs claimed that the bearing was defectively manufactured because it contained contaminants or debris when Textron sold it.

■ The record contains more than a scintilla of evidence to support the jury's manufacturing defect finding. Torrington concedes that there may be some evidence that the bearing was contaminated when it failed, but argues that there is no evidence it was contaminated when it was sold. In response, the plaintiffs point to the inspection of Torrington's Newington plant after the 1991 Rood crash, which was conducted jointly by Bell, Torrington, and the FAA. The FAA's report concluded that the cleaning processes Torrington used on—03 bearings were deficient, and that all newly-cleaned—03 bearings at Newington con-

tained contaminants and debris. Furthermore, a memorandum written by Bell's safety coordinator after the same inspection notes that "Fafnir has determined that the—05 bearing does also have metal contamination." There is evidence that the manufacturing processes at Newington were unchanged from those at the New Britain plant. That evidence includes a letter from Torrington assuring Bell that the processes used in Newington "have not changed" from those in New Britain. The letter states that the design control of "bearings manufactured in Newington for Bell Helicopters" is under the same Fafnir personnel, and that the Newington equipment and personnel are the same, equal, or superior to those involved in manufacturing the parts in New Britain.[13] From this evidence the jury could reasonably infer that the manufacturing processes at Newington commonly resulted in contaminated bearings, and that these deficiencies carried over from Textron's New Britain operation. Moreover, the letter suggests that the Newington manufacturing processes might even be superior to those at New Britain, indicating that the possibility of contamination at New Britain might have been greater.

In addition, James Roger Craddock, a civil engineer, concluded that debris in the grease caused the bearing to fail. He based his opinion upon his examination of the failed bearing and his review of deposi-

tions, documents relating to the bearing specifications, the bearing's history, and the FAA inspection report. Craddock testified that pitting in the bearing could have resulted from contamination in the cleaning process, or from damage caused by misalignment. While Craddock was not able to analyze the failed bearing's grease because of damage sustained in the crash, he testified that the contamination most likely resulted from Textron's cleaning process. He based that opinion on the fact that the helicopter's surviving members reported a burning smell before any significant vibration was noticed, the condition of the bearing, and the fact that the—05 bearing was a sealed bearing.

There was also evidence that Bell concluded that some—05 bearings were contaminated when sold. Roy Battles, a Bell engineer, testified that after the Rood crash, Bell tested unused—05 bearings and found debris in them. A series of Bell memoranda showed that Bell concluded, on the basis of its own tests, that unused—05 bearings, some of which were made at New Britain, were contaminated. The jury could reasonably conclude that if unused—05 bearings made in New Britain were contaminated, the contamination originated in the New Britain plant. Although Battles' testimony may have been self-interested, the jury was free to take that into account when assessing its probative value. We will not second guess their

13. Torrington argues that this letter should not have been admitted because it refers only to—03 bearings and is therefore irrelevant to this case. *See* TEX.R.EVID. 401, 402. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* TEX.R.EVID. 401. We must uphold the trial court's ruling that the letter was relevant if it has any legitimate basis. *See Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998).

First, the letter does contain a general reference to "bearings manufactured in Newington for Bell." Moreover, both—03 and—05 bearings were made at Newington and New Britain; therefore, Torrington's assurance that the manufacturing process for—03 bearings was unchanged has some tendency to show that the manufacturing process for—05 bearings was unchanged. Accordingly, the trial court did not abuse its discretion in admitting the evidence.

decision. Accordingly, we hold that more than a scintilla of evidence supports the jury's finding of a manufacturing defect in Textron's bearing.

■ Torrington further contends that the Navy did not follow its own three-year shelf-life policy for bearings, and that its failure to do so breaks the chain of causation.[14] But the evidence regarding the Navy's shelf-life policy is conflicting. There was evidence that the Navy had a shelf-life policy of "0" for the tail hangar assembly in which the bearing was installed, indicating that the assembly was non-deteriorative and did not have a limited shelf-life. The bearing had been installed in a tail hangar assembly in 1984 and then stored. A section of the Navy's bearing manual entitled "Protection of Bearings in Assemblies Going into Storage" notes that, if certain lubrication and sealing methods are observed, "[b]earings installed in most aeronautical equipment are adequately protected for the shelf life of the item," suggesting that the nondeteriorative rating of the hanger assembly could encompass a bearing installed in the assembly. Other evidence indicates that at least one department within the Navy assigned the bearing itself a "0," nondeteriorative, shelf life. To further complicate matters, a witness for Torrington testified that shelf life was not the same thing as "service life." In addition, the Navy's bearing manual suggests that designated bearing shelf lives were not absolute, but could be modified "by the local cognizant depot bearing engineer." Accordingly, Torrington did not defeat causation by conclusively establishing that the Navy failed to follow its shelf-life policy.

## VI

### Government–Contractor Defense

The trial court refused Torrington's request for a jury question on the government-contractor defense. Torrington contends that this refusal was reversible error. We disagree.

■ The government-contractor defense, also called the military contractor defense, is a federal common-law defense. It is based upon the premise that liability claims arising from government procurement contracts could create a significant conflict between state tort law and the federal interest in immunizing the federal government from liability for performing a "discretionary function," an act for which the government may not be sued under the Federal Tort Claims Act. See Boyle v. United Techs. Corp., 487 U.S. 500, 511, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988); Tate v. Boeing Helicopters, 55 F.3d 1150, 1153 (6th Cir.1995); 28 U.S.C. § 2680(a). The financial burden of judgments against contractors would ultimately be passed through to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, continued liability for government-ordered designs. See Boyle, 487 U.S. at 511–12, 108 S.Ct. 2510. Accordingly, liability for design defects in military equipment cannot be imposed under state law when (1) the United States approved reasonably precise specifications, (2) the equipment conformed to those specifications, and (3) the supplier warned the United States about the dangers in the equipment's use that were known to the supplier but not to the United States. Id. at 512, 108 S.Ct. 2510; Augustine v. Bell Helicopter Tex-

---

**14.** This argument by Torrington appears to be aimed only at the plaintiff's marketing defect claim, but that is not entirely clear. Our analysis assumes that it is directed toward the manufacturing defect claim as well.

*tron, Inc.,* 922 S.W.2d 287, 290 (Tex.App.— Fort Worth 1996, writ denied).

As *Boyle*'s language indicates, courts have not traditionally applied this defense to manufacturing defects. *See* 487 U.S. at 512, 108 S.Ct. 2510. That is because manufacturing defects are deviations from intended designs and therefore cannot be considered the product of an exercise of discretion. Torrington argues that the defense nevertheless shields Textron from liability based upon the bearing's alleged contamination, relying on *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311 (11th Cir.1989). In *Harduvel,* an F–16 crashed, killing the pilot. *Id.* at 1314. The jury, applying Florida law, found manufacturing and design defects in the plane and that the government-contractor defense did not apply. *Id.* at 1317, 1315. The Eleventh Circuit reversed and rendered judgment for the defendant, holding that the defense applied because the defect complained of was actually a design defect and not a manufacturing defect. *Id.* at 1322, 1317. Thus, *Harduvel* holds that, under the government-contractor defense, federal law determines the question of whether a defect is one of manufacturing or design. *Id* at 1317.

■ The *Harduvel* court emphasized that the defense's purpose is to protect the government's exercise of discretion. *Id;* see also *Tate,* 55 F.3d at 1154 ("Only when the government performed its discretionary function would state tort law liability frustrate a federal interest."). Therefore, liability for true manufacturing defects, which are deviations from intended designs, are not covered because they cannot be considered the product of an exercise of discretion. *See Mitchell v. Lone Star Ammunition, Inc.* 913 F.2d 242, 246 (5th Cir. 1990); *Harduvel,* 878 F.2d at 1317. As *amicus curiae* Texas Association of Defense Counsel notes: "The government-

contractor defense does not apply to manufacturing defects, but is designed to protect only those contractors that follow the government's directives."

■ We have already held that there is some evidence—the existence of contamination and debris—to support the jury's manufacturing defect finding. Citing *Harduvel,* Torrington argues that even this evidence does not preclude the government-contractor defense if the manufacturing defect is systemic. Again, Torrington misreads *Harduvel. Harduvel* holds that evidence of a systemic defect tends to show that the defect is one of design and not manufacture because, if a defect is common, it is more likely intended than unintended. *Harduvel,* 878 F.2d at 1317. But this distinction is ultimately one between an unintended configuration and an intended configuration that may produce unintended and unwanted results. *See id.* No one contends, and it would be untenable to argue, that a contaminated and debris-filled bearing was the configuration either the Navy or the manufacturers it employed intended. Accordingly, we hold that the trial court did not err in refusing to submit the government-contractor defense to the jury. Torrington further argues that, as Textron's successor, the government-contractor defense protects it from liability stemming from defects in the bearing Textron manufactured. But this ignores the fact that Torrington's liability is premised not on its status as a successor, but rather on its own conduct in allegedly negligently performing an undertaking. It is difficult to imagine that Torrington's failure to list unserialized bearings was the product of the exercise of government discretion and hence within the defense's intended purview. In any case, because we reverse and remand the judgment against Torrington, we leave application of the govern-

ment-contractor defense to the trial court to consider in light of the evidence adduced at trial.

## VII

### Choice of Law

The trial court concluded that North Carolina was the state with the most significant relationship to the compensatory damages issue. Because neither party introduced evidence of North Carolina law, and the parties agreed that damages would be the same under North Carolina or Texas law, the trial court submitted the damages issue under Texas law.[15] Torrington argues that the trial court erred in applying Texas law to the compensatory damages issue, and contends that either Michigan or Nebraska law should apply.[16] We agree with the court of appeals that the trial court did not err in applying Texas law.

 Which state's law governs an issue is a question of law for the court to decide. *See Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 204 (Tex.2000); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984). Texas uses the *Restatement's* "most significant relationship" test to decide choice-of-law issues. *See Hughes*, 18 S.W.3d at 205; *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex.1979); RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6, 145 (1971). Section 6 of the *Restatement* lists the general factors used to decide a choice-of-law question:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) (1971); *see Gutierrez*, 583 S.W.2d at 318–19. Some of the relevant contacts in a tort case are:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971).

 In a choice of law analysis, the number of contacts with a state is not determinative. *Duncan*, 665 S.W.2d at 421. Rather, we must evaluate the contacts in light of the state policies underlying the particular substantive issue. *Id.* The primary purpose of awarding compensatory damages in civil actions is not to punish the defendant, but to fairly compensate the injured plaintiff. *Cavnar v.*

---

**15.** As did the trial court, we will presume that North Carolina law accords with Texas law.

**16.** Applying either Michigan or Nebraska law would significantly reduce the plaintiffs' compensatory damage awards. For example, Michigan law does not allow the recovery of mental anguish damages. *See* MICH.COMP.

LAWS ANN. § 600.2922(6) (1986). Under Nebraska wrongful death law, only pecuniary losses may be recovered. *See* NEB.REV.STAT. § 30–810 (1995); *Williams v. Monarch Transp., Inc.*, 238 Neb. 354, 470 N.W.2d 751, 755–56 (1991).

*Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex.1985). A state's compensatory damages law balances the need to compensate the plaintiff against the goal of protecting resident defendants from undue liability and excessive litigation. *Cf. Huddy v. Fruehauf Corp.*, 953 F.2d 955, 958 (5th Cir.1992); John B. Austin, *A General Framework for Analyzing Choice–of–Law Problems in Air Crash Litigation*, 58 J. Air L. & Com. 909, 965 (1993).

 Considering the purpose of compensatory damages, contacts such as the site of the injury or where the tortious behavior occurred, which are important in determining which state's laws govern liability, are less important. *See* Restatement (Second) of Conflict of Laws § 145 cmt. e (1971) (noting that when, as here, the place of injury is fortuitous, then place of injury is not an important contact); *In re Aircrash Disaster Near Roselawn, Ind.*, 926 F.Supp. 736, 746 (N.D.Ill.1996); Austin, *supra*, at 967–68. Rather, the most important contacts in determining which state's law governs compensatory damages will usually be the "ones with the most direct interest in the plaintiff's monetary recovery and/or the most direct in protecting the defendant against financial hardship." Austin, *supra*, at 965; *see Burgio v. McDonnell Douglas, Inc.*, 747 F.Supp. 865, 871–73 (E.D.N.Y.1990) (stating "[c]ompensation of an injured plaintiff is primarily a concern of the state in which plaintiff is domiciled") (quoting *Bryant v. Silverman*, 146 Ariz. 41, 703 P.2d 1190,

1194 (1985)); *Emmart v. Piper Aircraft Corp.*, 659 F.Supp. 843, 846–47 (S.D.Fla. 1987).

 With these considerations in mind, we turn to the facts presented. When the crash occurred, Stutzman and Pulaski, and their spouses and children, resided in North Carolina where the Marines had stationed them. Although stationed in North Carolina, it is undisputed that Stutzman and Pulaski were domiciled in Nebraska and Michigan, respectively, when the crash occurred.[17] Although their connections to North Carolina are not as strong as those to their domiciliary states, the *Restatement* recognizes that a party's residence is a contact to be taken into account in choice-of-law decisions. *See* Restatement (Second) of Conflict of Laws § 145(2), cmt. e (1971) (noting that a party's residence is a place of "enduring relationship" to the party).

On the other hand, at least two of the defendants, Bell and Textron, had their principal places of business in Texas.[18] Accordingly, the states with the most significant connection to the damages issue are (1) Nebraska and Michigan, where the decedents were domiciled, (2) North Carolina, where the decedents and their families resided, and (3) Texas, where Bell and Textron maintained their principal places of business. *Cf.* Restatement (Second) of Conflict of Laws § 178 cmt. b (1971) ("In a situation where one state is the state of domicil[e] of the defendant, the decedent and the beneficiaries, it would seem that

17. A soldier does not acquire a new domicile merely by being stationed at a particular place in the line of duty. *See Commercial Credit Corp. v. Smith*, 143 Tex. 612, 187 S.W.2d 363, 366 (1945). Rather, a soldier's domicile remains the same as when he or she entered the service, unless proof of clear and unequivocal intention to change domicile is shown. *Id; see also* Restatement (Second) of Conflict of Laws § 17, cmt. d. (1971). The

evidence does not show this unequivocal intention to change domicile. Thus, Stutzman and Pulaski were domiciled in Nebraska and Michigan, respectively, when the crash occurred.

18. Torrington does not contend that the law of Connecticut, where the bearing was manufactured, should apply.

... the wrongful death statute of this state should be applied to determine the measure of damages."); *see* Austin, *supra*, at 965 ("Although a forum state which is not also the domicile of either the plaintiff or the defendant may have an interest in compensatory damages, this interest is inferior to the interests of either the plaintiff's state or the state of the defendant's principal place of business.").

We have noted that a plaintiff's domiciliary state usually has a strong interest in seeing its compensatory damages law applied. But Texas, as the forum state, also has a significant interest in protecting resident defendants, such as Bell and Textron. *See Huddy*, 953 F.2d at 958; Austin, *supra*, at 965. And other *Restatement* factors weigh in favor of applying Texas law. For example, much of the conduct that allegedly caused the injury occurred in Texas. The helicopter that was involved in the crash was manufactured and delivered in Texas, several communications about the bearing failure, as well as the Alert Services Bulletin that failed to identify unserialized–05 bearings as potentially defective, were issued from Texas, and Torrington sent communications about the investigation to Bell in Texas. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2)(b) (1971). Moreover, Texas is the forum state and the parties acquiesced to the trial court's application of Texas law to the liability issue. "Ease in the determination and application of the law to be applied" is one of the factors to be considered in resolving choice-of-law questions under the *Restatement*. RESTATEMENT

(SECOND) OF CONFLICT OF LAWS § 6(2)(g). Considering all of these factors, Michigan and Nebraska do not have an overriding interest in seeing their law applied in this case.

Nevertheless, Torrington urges us to hold that in air crash cases, a decedent's domicile always determines which state's law governs compensatory damages. This rule, Torrington argues, would deter plaintiffs from shopping for forums with the most favorable damages law. We find this argument unpersuasive. To the extent that plaintiffs forum shop, they are as likely to do so on the basis of liability law as on the basis of damages law. Moreover, adopting Torrington's absolute rule would only deter forum shopping if a majority of other states employed the same rule, which is not the case. While many courts have concluded that a decedent's domicile is the most significant contact under the particular facts, few have held that that factor alone should always be determinative.[19] We conclude that the trial court did not err in applying Texas law to the compensatory damages issue.

## VIII

### Apportionment of Jury Strikes

Torrington also complains that the trial court erred in apportioning peremptory jury strikes. *See* TEX.R.CIV.P. 233. The court awarded ten strikes to plaintiffs, four to Bell and Textron, two to Mobil, and four to Torrington and Ingersoll together. Torrington argues that Bell, Textron, Mobil, and the plaintiffs were all adverse to Tor-

19. *See, e.g., Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 13–15 (2d Cir.1996); *In re Aircrash Disaster Near Roselawn, Ind.*, 926 F.Supp. at 746 (agreeing that applying the plaintiffs' domicile state's laws will discourage forum shopping, but stating only that the law of the plaintiffs' domicile state will "usually" govern); *Anderson v. SAM Airlines*, 939 F.Supp. 167, 173–74 (E.D.N.Y.1996); *Burgio*, 747 F.Supp. at 871–73; *Emmart*, 659 F.Supp. at 846–47; *Felch v. Air Florida, Inc.*, 562 F.Supp. 383, 386–87 (D.D.C.1983); *Baird v. Bell Helicopter Textron*, 491 F.Supp. 1129, 1151–52 (N.D.Tex.1980); *Wood v. American Airlines, Inc.*, 103 Misc.2d 431, 432–34, 426 N.Y.S.2d 193 (1979).

rington and that strikes should have been apportioned accordingly. Because we reverse the judgment against Torrington, we need not consider how this apportionment affected the judgment against it. Torrington further contends, however, that the alleged misapportionment led to the judgment against Textron. But if, as Torrington argues, Textron and the other defendants were actually adverse to Torrington, then any error in the apportionment of strikes would be to Textron's advantage. Thus, misapportionment of strikes could only have contributed to the judgment against Textron if Textron colluded in obtaining the judgment against itself. We have already held that Torrington did not conclusively establish such collusion. Accordingly, Torrington has not shown that any error in the apportionment of strikes probably caused the rendition of an improper judgment against Textron. *See* Tex.R.App.P. 44.1.

## IX

### Runaway Jury

Torrington argues that the actual and punitive damages awarded by the jury are so excessive as to suggest that the jury's liability findings resulted from passion or prejudice.[20] Torrington does not contend that the evidence supporting the damages is legally insufficient. Instead, Torrington argues that it is entitled to a new trial because "[a] jury that gets damages egregiously wrong probably got liability wrong, too." Torrington relies upon our decision in *World Oil Co. v. Hicks,* 129 Tex. 297, 103 S.W.2d 962, 964 (1937), as authority for looking to the amount of damages to hold that liability findings were erroneous.

In *World Oil,* we noted that "[t]here are cases where a shockingly excessive verdict, *and the record as a whole, leave no room for doubt* that the minds of the jurors were so controlled and dominated by passion and prejudice as made them incapable of, or entirely unwilling, to consider a case on its merits." 129 Tex. 297, 103 S.W.2d 962, 964 (1937) (emphasis added). We emphasized, however, that remittitur is the appropriate remedy "unless [the verdict] is so flagrantly excessive that it cannot be accounted for on any other ground." *Id.* We did not disturb the verdict in that case, and we have never relied on *World Oil* to overturn a verdict.

▆▆▆▆ Since we decided *World Oil,* we have issued a number of decisions about the remedies for purportedly excessive verdicts. In *Pope v. Moore,* we held that an appellate court may not order a remittitur unless the evidence supporting damages is factually insufficient. *See* 711 S.W.2d 622, 623 (Tex.1986). Concomitantly, trial courts may not order a remittitur when factually sufficient evidence supports a damages award. *See Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 641 (Tex.1987). Because this Court is not empowered to determine factual sufficiency questions, *see Read v. Scott Fetzer Co.,* 990 S.W.2d 732, 736–37 (Tex.1998), the continued vitality of *World Oil* is questionable. Nevertheless, the size of the verdict in this case and the record as a whole fails to "leave no room for doubt" that the jury's liability findings resulted from passion or prejudice. As we have noted, Torrington does not contest the legal sufficiency of the evidence to support the damages awarded by the jury, and the record contains more than a scintilla of evidence to support liability. Thus, we cannot conclude, based upon this rec-

---

20. We reach this point despite our disposition of the plaintiffs' claims against Torrington because if we were to accept this argument, the liability finding against Textron would likewise presumably be tainted.

ord, that the jury failed to consider Textron's liability on its merits.

## X

### Attorney Ad Litem Fees

█ Finally, Torrington complains of the trial court's award of attorney *ad litem* fees without supporting evidence. Generally, an award of attorney's fees must be supported by evidence. *See, e.g., Cherne Indus., Inc. v. Magallanes,* 763 S.W.2d 768, 772–73 (Tex.1989). Under the circumstances of this case, however, we conclude that Torrington waived any right to complain of the *ad litem* fees.

█ The record reveals that the *ad litem* fee issue was raised at a hearing on the plaintiffs' motion for judgment and Torrington's motion for judgment notwithstanding the verdict. The trial court inquired whether anyone had a suggestion as to what the fee should be. An off-the-record discussion among the parties' counsel ensued. Back on the record, the plaintiffs' counsel suggested a $50,000 fee for trial work, $25,000 if the case was appealed to the court of appeals, and $15,000 if the case was appealed to this court. Torrington's counsel stated that the defendants did not believe appellate fees to be appropriate for an *ad litem,* and then suggested that $25,000 would be a reasonable and necessary fee. He did not allude to the necessity of supporting evidence or indicate any objection to the court making a decision based upon the parties' suggestions.

Before this Court, Torrington argues that its counsel suggested a fee only "to avoid an appeal on th[e] issue." Presumably, if the trial court had accepted Torrington's suggestion of a substantially lesser fee, Torrington would no longer object to the trial court's decision-making procedure. We hold that, by its conduct, Tor-

rington waived any right to complain of the *ad litem* fees.

## XI

### Conclusion

In summary, we hold that the broad-form negligence question against Torrington was immaterial, but we remand the plaintiffs' undertaking claim against Torrington to the trial court in the interest of justice. We further hold that the trial court did not err in finding that Torrington must indemnify Textron and that legally sufficient evidence supports the judgment against Textron. Additionally, we hold that Torrington has standing to challenge the legal sufficiency of the evidence to support the jury's finding that the bearing was defective. We also hold that Textron was not entitled to a jury question regarding the government-contractor defense, that the trial court did not err in applying Texas law to the damages issue, and that we may not on this record set aside the verdict for excessiveness. Finally, we hold that Torrington waived any right to complain of attorney *ad litem* fees the trial court awarded. We therefore reverse the judgment against Torrington and remand the plaintiffs' claims against it to the trial court. We affirm the judgment against Textron and against Torrington as Textron's indemnitor.

Justice HECHT, joined by Justice OWEN, dissenting.

I respectfully dissent. A new trial in this case is not justified. The record before us contains no evidence to support a judgment against Torrington on plaintiffs' voluntary-undertaking theory or against Textron for product liability. I would render judgment that the plaintiffs take nothing.

The plaintiffs did not plead a voluntary-undertaking claim against Torrington. They may not even have thought of this theory of recovery until after the trial was over and a verdict had been returned. But assuming that the claim was somehow tried by consent and not simply by accident, I agree with the Court that the judgment against Torrington must be reversed because the jury was not told what the essential elements of the claim are or asked to decide whether the plaintiffs had proved all of those elements. I disagree that the case should be remanded for a new trial in the interest of justice. I have two reasons.

*First:* justice does not require that the plaintiffs be given a second trial to do what they should have known to do in the first trial, which was to ask the jury whether they proved each element of their voluntary-undertaking claim. We have sometimes remanded a case for a new trial when parties were reasonably confused about the substantive law,[1] but this is not such a case. According to the Court, the elements of a voluntary-undertaking claim are clearly stated in section 323 of the *Restatement (Second) of Torts,* published in 1965, and in this Court's 1976 opinion in *Colonial Savings Association v. Taylor.*[2] Findings of negligence and causation—the only findings requested by the plaintiffs in this case—are necessary but not sufficient to establish liability on a voluntary-undertaking claim. As the Court states: "We have never held that a person may be liable on an undertaking theory without

establishing reliance or increased risk of harm, and we decline to do so now."[3] The plaintiffs in this case established neither reliance nor increased risk and requested no jury findings on these issues. Why then should they be given a new trial?

Because, the Court answers, the plaintiffs could not have known before today's decision that they needed findings on all elements of their cause of action in order to recover; they might reasonably have believed that findings on negligence and causation were enough. Specifically, the Court says:

> We have never considered how an undertaking claim should be submitted to the jury, nor had the courts of appeals directly addressed the issue at the time this case was tried.

> Because neither this Court nor any other appellate court had written about the proper submission of an undertaking claim at the time this case was tried, it is appropriate to remand this case in the interest of justice.[4]

The confusion in the law that justifies a new trial, the Court says, is not over what the elements of a voluntary-undertaking claim are, but over whether they must all be submitted to the jury.

This is a truly remarkable justification for ordering a new trial. I would have thought that the idea that a plaintiff must prove each element of his cause of action was so basic that it was not necessary for this Court or any court to reaffirm the requirement on a case-by-case basis.[5]

---

1. *See, e.g., Spencer v. Eagle Star Ins. Co. of Amer.,* 876 S.W.2d 154, 157 (Tex.1994); *Boyles v. Kerr,* 855 S.W.2d 593, 603 (Tex. 1993); *Westgate, Ltd. v. State,* 843 S.W.2d 448, 455 (Tex.1992).

2. 544 S.W.2d 116, 119–120 (Tex.1976).

3. *Ante* at 838 n. 7.

4. *Ante* at 838 (citations omitted).

5. *Keetch v. Kroger Co.,* 845 S.W.2d 262, 267 (Tex.1992) ("It should hardly need be said that broad form submission does not entail omitting elements of proof from the charge. Broad form involves inclusion of multiple elements within a single question, usually by adding accompanying instructions, when it is

Moreover, we firmly rejected the argument in *Keetch v. Kroger Co.* that a finding of negligence and causation would support liability for a premises defect without findings on the other essential elements of the liability theory.[6] In principle, *Keetch* is indistinguishable from the present case. The rationale used by the Court to decide both cases is exactly the same.[7] The Court in this case cites *Keetch* as its principal authority. How then does the Court conclude that the plaintiffs could reasonably have believed after *Keetch* that they could establish liability for a voluntary undertaking without obtaining favorable findings on all elements of the claim? The answer is that the Court treats *Keetch* as merely an ad hoc determination of how to submit a premises liability claim to a jury that says nothing about how to submit any other claim with multiple elements. To justify a new trial in this case, the Court must rob *Keetch* of principle.

The weakness in the Court's position is also demonstrated by the evidence it cites—one case and one article—in support of its assertion that the proper submission of a voluntary-undertaking claim is mired in confusion.[8] The case, *Park v. Larison,*[9] decided just four months ago, long after the trial in the present case, holds that the

trial court did not err in refusing *the plaintiffs'* request for a jury instruction on the elements of a voluntary-undertaking claim, apparently because no such claim was involved in the case. Nothing in the court's opinion suggests that a plaintiff can establish voluntary-undertaking liability on findings of negligence and causation alone. The article the Court cites, *Judge and Jury in the Texas Supreme Court,*[10] was authored by Dean Powers, Tarrington's counsel in this case. According to the Court, the article notes "a wide split in authority about whether fact questions that form the predicate for a duty should be decided by the court or the jury."[11] That is true, but only in the context of determining whether a duty exists in particular circumstances. The article never suggests that if a duty exists, essential elements of liability can be decided by the court rather than a jury. It is impossible to imagine that an attorney could reasonably conclude from either the *Park* case or Dean Powers' article that a voluntary-undertaking claim could properly be submitted to the jury without mention of all of its essential elements.

There is nothing in the record, or even in the arguments on appeal, to indicate that the plaintiffs thought about *Colonial*

---

feasible to do so. It alters only the form of the charge, not the substance.") (Hecht, J., concurring).

**6.** *Id.* at 267.

**7.** The Court says: "Here, the broad-form negligence question allowed the jury to hold Torrington liable regardless of whether Torrington knew or should have known that its services were necessary to protect others. *Cf. Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994). The question also allowed an affirmative answer regardless of whether anyone relied upon Torrington's undertaking, or whether Torrington's performance of its undertaking increased the plaintiff's risk of harm. Because the question al-

lowed the jury to find Torrington liable even if the plaintiffs did not establish the necessary factual predicates for a negligent undertaking duty, it was erroneous. These essential elements of an undertaking claim should be included in the instructions accompanying a broad-form negligence question. *Cf. Keetch v. Kroger Co.,* 845 S.W.2d 262, 267 (Tex. 1992)." *Ante* at 840.

**8.** *Ante* at 841 n. 10.

**9.** 28 S.W.3d 106 (Tex.App.—Texarkana 2000, no pet. hist.).

**10.** 75 Tex L.Rev. 1699, 1716 (1997).

**11.** *Ante* at 841.

*Savings,* section 323 of the *Restatement, Keetch,* and Dean Powers' article, and decided that the only findings needed to support a voluntary-undertaking claim against Torrington were negligence and causation. The Court orders a new trial not because of any confusion in the law, but because it wants the plaintiffs to have one. The result is in the interest of fiat, not in the interest of justice.

*Second:* the error in submitting the voluntary-undertaking claim to the jury was harmless and cannot justify a new trial unless there was some evidence of each element of the claim, and for three elements there was none.[12]

The Court concludes that there is some evidence to support the plaintiffs' contention "that Torrington assumed a broader undertaking to investigate and identify all potentially defective bearings".[13] The Court states that this contention is "supported to some extent by the fact that Torrington ultimately gave Textron a list of serial numbers for both—03 and—05 bearings, some of which were manufactured at the New Britain plant." [14] The Court cites no other evidence that could possibly support the plaintiffs' contention, and that is because none exists. Torrington supplied the list of serial numbers to Bell in response to Bell's request after an investigation into the Rood crash involving a helicopter with a—03 bearing. Torrington argues that any duty it undertook to identify faulty bearings was limited to the—03 bearing. Inferring from Torrington's response to an inquiry from Bell that Torrington had voluntarily undertaken to identify all its defective bearings is a stretch. But while the response listed—03 and—05 bearings, it listed no bearings manufactured by Torrington's predecessor, and Bell's parent, Textron. Nothing about the list of serial numbers Torrington gave Bell remotely suggests that Torrington undertook to identify defective bearings *that it did not manufacture.* All of the evidence shows that Torrington had no reason to undertake an investigation of Textron bearings. Torrington did not own the plant when those bearings were manufactured. The investigation had not indicated that such bearings were defective or contaminated. The shelf life of the bearings was three to five years, and Textron had ceased manufacturing bearings six years before the investigation, so there was no reason to suppose that Textron bearings were still in use. Moreover, the evidence suggests no reason why Torrington would voluntarily undertake to determine for Bell whether Bell's parent had manufactured defective bearings. If Bell had wanted that information—and there was no reason why it should, given the shelf life of the bearings—it would have asked its parent, Textron, who manufactured the bearings. Not only is there no evidence that Torrington ever undertook to investigate Textron's bearings, all of the evidence indicates that it would never have done so.

To submit a voluntary-undertaking theory to the jury, there must also have been evidence either that Torrington's negligent performance of its undertaking increased the risk of harm, or that the Navy relied on Torrington's undertaking. The Court does not even discuss this element of the theory. Assuming that Torrington undertook to inform the Navy whether Textron's bearings were defective—even though as I have said, there is absolutely no evidence of such an undertaking—the issue becomes whether Torrington's undertaking made

---

**12.** *See Wilson v. Texas Parks & Wildlife Dept.,* 8 S.W.3d 634, 635 (Tex.1999).

**13.** *Ante* at 839.

**14.** *Ante* at 839.

the Navy worse off than if Torrington had done nothing. In other words, if Torrington had refused to cooperate with the investigation, would the Navy have taken other action that would have reduced the risk of harm from any defective bearings? The plaintiffs have cited no such evidence. When asked at oral argument whether any such evidence existed, counsel answered that it was simply "common sense" that the Navy would have done more. When the Navy did not follow its own safety procedures to reduce the risk of harm from bearings that were identified as possibly defective, and did not follow its shelf life policy to ensure that bearings were not employed after they were no longer dependable, there is no reason to think that it would have undertaken its own investigation to try to determine whether bearings manufactured six years earlier were defective.

Finally, there must have been evidence that Torrington's failure to use reasonable care in undertaking to determine whether six-year-old Textron bearings were defective caused the helicopter crash, and there was none. The Navy assigned the bearings a three-year shelf life and required that they be removed at the end of that time, as the plaintiffs' witnesses uniformly conceded at trial. Had the Navy followed its own shelf life policy, the bearing would never have been installed in the helicopter.

The Court's assertion that evidence on the shelf life of the bearings was conflicting is simply wrong. The Court reads the Navy bearing manual to "suggest[ ] that the nondeteriorative rating of the hangar assembly could be applied to a bearing installed in the assembly." [15] This is not a reasonable reading of the manual. It makes no sense to say that a bearing should not be in service more than three years after it was manufactured, but if it is installed in an assembly it will last forever. Service deteriorates a bearing. Service certainly does not make a bearing nondeteriorative, and not surprisingly, the Navy manual does not suggest otherwise. All the manual says is that if a bearing is properly installed and maintained, it—"the item"—should last for as long as its shelf life—here, three years. The Court also states that one department of the Navy assigned the—05 bearing a "0" shelf life, indicating that the bearing was "nondeteriorative". [16] This conclusion was refuted at trial by plaintiffs themselves. Regarding the Navy materials to which the Court refers, plaintiffs offered the following testimony at trial:

Q What does this say right here, beginning of paragraph 100?

A "Per Ref D Naval Supply Systems Command NavSup is designated the Navy's managing agent for the shelf-life program. As such, NavSup is responsible for the control of shelf life items to include assigning shelf-life codes."

Q Read the next sentence.

A "NavSup assigns shelf-life codes based upon advice or decision of military service technical/engineering support activities furnished to the integrated material manager. The shelf-life code assigned by NavSup to the tail rotor drive shaft hanger bearing is zero"—or it could be "no"—"nondeteriorative."

Q "Non"—I'm not going to be able to pronounce it either well-"nondeteriorative." So, the Navy has reviewed this and has done its own analysis that this bearing—and we know that they have their own shelf life manager; and we know now, based on what you told us,

---

**15.** *Ante* at 846.

**16.** *Ante* at 846.

that they have a three-year shelf-life policy for this bearing.

A Unless otherwise modified by the depot bearing engineer.

Q Do you know if that has ever been modified by the depot bearing engineer prior—prior to this accident?

A That, I do not know.

The Court adds, as this testimony indicates, that bearing shelf lives could be modified "by the local cognizant depot bearing engineer,"[17] but there is no evidence that any modification was ever made affecting the bearing in question.

Not one witness at trial, including the plaintiffs' witnesses, was confused about the Navy shelf life policy for—05 bearings. Even if there had been confusion about the Navy policy, responsibility for that confusion would have belonged to the Navy, not Torrington. Torrington never suggested to the Navy that the bearings had a shelf life longer than five years.

The Court simply ignores the inescapable fact that if the Navy had followed its own policy in 1987, nothing Torrington did or did not do in 1990 could have caused any harm. In *General Motors Corp. v. Saenz,* we held that if an accident would not have occurred had the manufacturer's warning been heeded, the manufacturer's failure to give a different warning could not be said to have caused the accident.[18] Similarly here, because the Navy's adherence to its own shelf-life policy would have prevented the accident, nothing Torrington failed to do can be said to have caused the helicopter crash.

The same argument applies to Textron. Assuming that its bearing was defectively designed, manufactured, and marketed, the defects could not have caused the harm in this case if the Navy had followed its own shelf-life policy. For this reason, there was no evidence to support the plaintiffs' claim against Textron, and no reason now to order a new trial.

Accordingly, I agree with the Court that the judgment for the plaintiffs must be reversed, but I would not remand the case for a second trial.

---

17. *Ante* at 846.

18. 873 S.W.2d 353, 361 (Tex.1993).