COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

ABELARDO OLIVAS,
Individually and as            )

Next Friend of ADAN OLIVAS,
A Minor,            )

BARTOLO OLIVAS and Wife,
MARIA               )

OLIVAS,                                                              )

                                                                              )              No.  08-02-00090-CV

Appellants,                         )

                                                                              )                 Appeal from the

v.                                                                           )

                                                                              )             
142nd District Court

SOUTHWEST ROYALTIES
HOLDINGS,          )

INC., SOUTHWEST ROYALTIES,
INC.,           )          of Midland County,
Texas

SOUTHWEST PARTNERS, II,
L.P.,                   )

SOUTHWEST PARTNERS, III,
L.P.,                  )               
(TC# CV-42,652)

                                                                              )

Appellees.                          )

                                                                              )

 

 

MEMORANDUM   OPINION

 








This is an appeal
from a summary judgment entered in favor of Appellees.  On appeal, Mr. Olivas,
individually and as next friend to his son, Adan Olivas, and his parents Bartolo
and Maria Olivas (collectively AAppellants@)
raise eight issues, six of which challenge the trial court=s findings that:  (1) as a matter of law Southwest Royalties
did not have a duty of care to Appellants; (2) there was no evidence of a
relationship between Sierra Well Service and Southwest Royalties that would
give rise to a duty of care to Appellants; (3) as a matter of law Southwest
Royalties did not breach its duty of care to Appellants; (4) there was no
evidence that Southwest Royalties breached its duty of care to Appellants; (5)
as a matter of law the acts and/or omissions of Southwest Royalties constituting
breach of its duty were not a proximate cause of injury to Appellants; and (6)
there was no evidence that the acts and/or omissions of Southwest Royalties
constituting breach of its duty were a proximate cause of injury to Appellants.  In Issue Seven, Appellants argue that there
is some evidence of gross negligence on the part of Southwest Royalties,
precluding summary judgment.  In their
remaining issue, Appellants contend that the trial court erred in sustaining
Southwest Royalties= special
exceptions on the basis that Abelardo Olivas=
parents do not have a cause of action for loss of companionship and society for
injury to their adult son.  We affirm.

BACKGROUND

On January 9,
1999, Abelardo Olivas, an
employee of Sierra Well Service, Inc. (ASierra@), was seriously injured at Rig 801, a workover rig owned by Sierra at an oil well site on the
Nimrod Lease in Howard County, Texas. 
Mr. Olivas was working as a floor hand with
the rig crew when a wire cable, the tubing line, broke during operations and
hit Mr. Olivas in the head, knocking him off the rig
floor.  Mr. Olivas
struck the catwalk as he fell to the ground. 
Mr. Olivas suffered injuries to his head,
neck, and back and was left unable to use his legs.  According to Chester Lyndon Wigington, Sierra=s
area manager, prior to 1999, Sierra=s
operating procedures did not include any written standards related to how to
assess cables, rather Sierra employed a system of
visual inspection.  In late 1998, Presi Gonzalez, the derrick man, informed Steve Lopez, the
rig operator, who then twice informed James Grimsley,
the field supervisor of Rig 801, that the wire cable was starting to show wear
and that it needed to be replaced. 
Mr. Grimsley told Mr. Lopez that the
company would order a replacement.  About
two or three months later the cable broke and Mr. Olivas
was injured.








Appellants brought
a personal injury suit against Southwest Royalties Holdings, Inc., Southwest
Royalties, Inc., Southwest Partners II, L.P., Southwest Partners, L.P.,
Southwest Partners III, L.P. (ASouthwest
Defendants@), Star
Tool Co., and Nimrod Petroleum, Co.[1]   Southwest Defendants filed special
exceptions against Intervenors, Bartolo
and Maria Olivas, asserting that they had no cause of
action for the loss of companion of their adult son.  The trial court sustained the exceptions and
gave Intervenors the opportunity to replead, which they did. 
Defendants then filed a No-Evidence and Summary Judgment Motion, which
the trial court granted on February 7, 2002. 
In their motion, Southwest Defendants argued inter alia that their stock ownership in Sierra did not
impose liability for Sierra=s
torts and that they had no duty to protect Sierra=s employees from harm nor did they
assume such a duty.  Appellants now
appeal the trial court=s
summary judgment order and the trial court=s
ruling on Appellees=
special exceptions.

DISCUSSION

Standards
of Review

Southwest
Royalties filed a traditional and no-evidence motion for summary judgment in
this cause, which the trial court granted without specifying the grounds upon
which the trial court relied.  When a
trial court=s order
granting summary judgment does not specify the ground or grounds relied upon
for its ruling, summary judgment will be affirmed on appeal if any of the
summary judgment grounds advanced by the movant are
meritorious.  Dow
Chemical Co. v. Francis, 46 S.W.3d 237, 242
(Tex. 2001); Carr v. Brasher, 776 S.W.2d
567, 569 (Tex. 1989).








A no-evidence
summary judgment is properly granted if the non-movant
fails to bring forth more than a scintilla of probative evidence to raise a
genuine issue of material facts as to an essential element of the non-movant=s
claim on which the non-movant would have the burden
of proof at trial.  See Tex.R.Civ.P. 166a(i); Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997), cert.
denied, 523 U.S. 1119, 118 S.Ct. 1799, 140
L.Ed.2d 939 (1998).  If the evidence
supporting a finding rises to a level that would enable reasonable, 

fair-minded
persons to differ in their conclusions, then more than a scintilla of evidence
exists.  Havner,
953 S.W.2d at 711. 
Less than a scintilla of evidence exists when the evidence is Aso weak as to
do no more than create a mere surmise or suspicion@
of a fact, and the legal effect is that there is no evidence.  Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  A 

no-evidence
summary judgment is essentially a pretrial directed verdict, therefore we apply
the same legal sufficiency standard of review as we apply in reviewing a
directed verdict.  Jackson
v. Fiesta Mart, Inc., 979 S.W.2d 68, 70 (Tex.App.--Austin
1998, no pet.).

A movant for traditional summary judgment rule must establish
that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of
law.  See Tex.R.Civ.P. 166a(c); Nixon
v. Mr. Property Management Co., Inc., 690 S.W.2d 546, 548 (Tex. 1985).  In deciding whether there is a disputed
material fact issue precluding summary judgment, all admissible evidence
favorable to the non-movant will be taken as true;
every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in the non-movant=s
favor.  Nixon,
690 S.W.2d at 548-49; Collins v. County of El Paso, 954 S.W.2d 137, 145
(Tex.App.--El Paso 1997, pet. denied). 

 








Assumption
of  Duty

On appeal,
Appellants assert that the trial court erred in granting summary judgment
because there was some evidence that Southwest Royalties had a duty to Mr. Olivas under Section 324A of the Restatement (Second) of
Torts to use reasonable care in obtaining and supplying safety information and
equipment maintenance standards to Sierra that related to wire rope.  Appellants argue that Southwest Royalties
assumed this duty under a contractual agreement with Sierra to provide certain
services to Sierra upon its request.[2]  

A legal duty must
exist before a defendant can be liable for negligence.  Reeder v. Daniel, 61
S.W.3d 359, 364 (Tex. 2001). 
Whether a duty exists under a given set of laws is a question of
law.  See Fort Bend County Drainage
Dist. v. Sbrusch, 818 S.W.2d
392, 395 (Tex. 1991).  Appellants
base their claim on Section 324A of the Restatement (Second) of Torts, which
Texas courts have recognized as a theory of liability.  See Torrington
Co. v. Stutzman, 46 S.W.3d 829, 837-38 (Tex.
2000); Sbrusch, 818 S.W.2d at 396 (Tex. 1991).  Section 324A provides: 

One who undertakes, gratuitously or for
consideration, to render services to another which he should recognize as
necessary for the protection of a third person or his things, is subject to
liability to the third person for physical harm resulting from his failure to
exercise reasonable care to protect his undertaking, if

 

(a)        his failure to
exercise reasonable care increases the risk of such harm, or

 

(b)        he has
undertaken to perform a duty owed by the other to the third person, or 

 

(c)        the harm is
suffered because of reliance of the other or the third person upon the
undertaking.








See Restatement (Second) of Torts '
324A (1965); Sbrusch, 818 S.W.2d at 396; Seay v. Travelers Indem.
Co., 730 S.W.2d 774, 775-76 (Tex.App.--Dallas 1987, no writ).

In order to
establish a negligence duty based on Section 324A, Appellants must show
evidence that Southwest Royalties undertook to render services to Sierra, which
it should have recognized as necessary for the protection of Mr. Olivas, a Sierra employee. 
Second, Appellants must also show that Southwest Royalties failed to
exercise reasonable care in undertaking these services and:  (1) that the risk of physical harm to Mr. Olivas increased due to Southwest Royalties= failure; or (2) that Southwest
undertook to perform a duty owed by Sierra to Mr. Olivas;
or (3) that the harm suffered by Mr. Olivas was the
result of his reliance or Sierra=s
reliance upon Southwest Royalties undertaking the rendered services.  See Seay, 730 S.W.2d at 775-76.

The first inquiry
under Section 324A is whether Southwest Royalties undertook a duty to protect
Sierra=s
employees.  See Sbrusch,
818 S.W.2d at 396; Seay, 730 S.W.2d at
776.  Specifically, Appellants assert
that Southwest Royalties assumed this duty by undertaking to obtain and supply
safety information and equipment maintenance standards to Sierra relating to
wire rope under a service agreement entered by the parties in 1997.  








Summary judgment
evidence in the record provides the following facts with respect to the
contractual relationship between Southwest Royalties and Sierra.  Bill Coggan was a
vice president of Southwest Royalties and an active officer and director of
Sierra until 1998.  Mr. Coggan testified in his deposition that Sierra was formed
in 1992 and was initially a wholly-owned subsidiary of Southwest Royalties,
which is an oil and gas company that operates and
develops properties.  Southwest Royalties
had a need for well servicing in the Permian Basin and started Sierra with the
idea that it would become its own entity and provide these services to
Southwest Royalties and other companies. 
At the time of Mr. Olivas= injury, Sierra was no longer a
subsidiary of Southwest Royalties, however, Southwest
Royalties remains a related company.

Between its
formation in 1992 and 1995, Sierra developed an independent field management
infrastructure.  In 1993, Joey Fields
became president of Sierra, and in 1995, Dub Harrison was hired to take over
the role of safety and equipment manager and to build the field management
infrastructure.  Mr. Fields and Mr.
Harrison ran the company and their expertise was mostly on the operational
side.  At that time, Mr. Coggan was in charge of accounting operations at Southwest
Royalties.  Since Sierra was a
wholly-owned subsidiary, Mr. Coggan and Southwest
Royalties employees were involved in setting up the initial bookkeeping and
financial reporting procedures, and insurance policies.  Southwest Royalties owned the source code for
its software and made some modifications to fit a well servicing company.  Southwest Royalties personnel performed the
clerical duties of accounts payable, accounts receivable, cash receipts, and
journal entries, and Southwest Royalties assigned an accountant to do the
reconciliation functions and journal entry preparations.  As Sierra became its own entity and developed
its infrastructure, these administrative functions were either passed to Sierra
personnel or Sierra hired persons from the outside to do these functions.








By 1997, if not
earlier, Sierra had its administrative infrastructure almost in place.  Mr. Coggan,
however, still provided assistance in his capacity as a Southwest Royalties
vice president under a management agreement between Southwest Royalties and
Sierra, which was later superceded by a general service agreement in September
1997, the contract which is now at issue. 
The 1997 Service Agreement provides the following with respect to
services to be rendered by Southwest Royalties:

1.         Services.  SWR [Southwest Royalties] will endeavor to
perform (or appoint an agent or agents to perform) or provide for the Company
[Sierra] such advisory, administrative, technical and other services as may be
reasonably requested by the Company in the conduct of its business activities,
including without limitation, the performance or provision of:

 

(a)        accounting, bookkeeping, invoicing,
computing, tax and other management information services; provided the Company
agrees to set up and maintain its books and records in such manner that
Southwest Royalties Holdings, Inc., of which SWR is a wholly owned subsidiary
and the Company is an affiliate can use and integrate the information contained
therein in its consolidated financial and tax accounting records to the extent
applicable;

 

(b)        advisory
services for legal, contract, real estate, claims and insurance matters;

 

(c)        advice in the
purchase of any goods, materials, or services which the Company may require and
assistance in expediting delivery of same;

 

(d)        assistance in
preparing budgets, plans, and programs, related to the Company=s business activities;

 

(e)        assistance in preparing the programs,
specifications, analyses, and evaluations, for the design, development, construction
and maintenance of equipment, facilities, and other undertakings associated
with the Company=s
business activities; 

 

(f)         credit
services including (1) research and advice as to the credit worthiness of potential
customers, contractors and suppliers and (2) assistance in the collection of
outstanding receivables;

 

(g)        banking, cashiering, and disbursement
services including (1) establishment, operation, and reconciliation of bank
accounts; (2) vouchering and banking of cash receipts; (3) establishment of
letters of credit, performance bonds, and bank guarantees; and (4) processing
and funding of cash disbursements including invoices, payments and call for
fund payments;








(h)        investment
services and cash management including placement of surplus cash in short term
investment securities; 

 

(i)         financing services including assistance in the arrangement
of funding from (1) third party lenders or (2) affiliated companies as
permitted;

 

(j)         administrative, accounting and record
keeping services associated with real estate and personal property leases, and
lease operations, including, but not limited to the payment of rents, fees and
maintenance changes due under leases;

 

(k)        administrative
and human resources services;

 

(l)         assistance in
the negotiation of contracts in the Company=s
business;

 

(m)       assistance in
negotiating or bidding for personal and or real business properties;

 

(n)        securing
operational, management and administrative personnel needed in the conduct of
the Company=s
business; 

 

(o)        assistance with travel and
transportation planning and services; provided that SWR shall have no authority
hereunder to conclude or accept contracts or orders in the name of the Company
or otherwise enter into obligations on behalf of The Company except for the
purchase of goods and services as hereinabove mentioned.  

 

Mr. Coggan testified that during 1997, he worked with Mr.
Fields, Mr. Harrison, and Debbie Brock, a Southwest Royalties accounting
administration employee, on financial matters and on evaluating acquisitions
from a financial standpoint.  Mr. Coggan assisted in working through budgetary information in
so far as what to budget for, maintenance, and capital expenditures.  According to Mr. Coggan,
this work fell off in 1998, and by 1999, he was no longer involved.  








Ms. Brock also
testified in her deposition about the services Southwest Royalties performed
for Sierra.  Ms. Brock recalled that
until January 1998, Southwest Royalties performed all the accounting and
administrative duties because Sierra did not have any in-house staff for
accounting administration.  These
services included accounting, payroll, financial negotiations with lenders,
investment bankers, setting up Sierra=s
accounting system, and due diligence on the accounting side of
acquisitions.  It was her understanding
that Sierra handled the operations side and was responsible for safety and that
Southwest Royalties had no role with respect to implementing personnel safety
policies.  Her department was involved in
analyzing different expense items, including repairs and maintenance, and fund
availability, but Sierra made the decisions on the operations side regarding
equipment acquisition.  

During his
deposition, Mr. Coggan was asked to explain the types
of services Southwest Royalties provided to Sierra under paragraph (e) of the
1997 Service Agreement.  Mr. Coggan stated that with respect to assistance in preparing
program, specifications, and analyses of equipment, Southwest Royalties
provided assistance on the administrative and financial side.  For example, Southwest Royalties obtained
inventory and equipment information for possible acquisitions.  Mr. Fields would hire someone or his field
personnel would go out and do an actual inventory of the prospective acquisition,
except for one occasion in which Southwest Royalties personnel counted pipe
inventory for a transaction.  According
to Mr. Coggan, Southwest Royalties did not assist in
preparing any kind of programs that related to maintenance or safety of drilling
or rig equipment nor was such assistance requested because it was out of their
area of expertise.








Mr. Coggan was also asked whether Southwest Royalties had
anything to do with preparing any kind of employee safety manuals.  Mr. Coggan stated
that the only time that Southwest Royalties was involved in this would have
been in the early days when Sierra was a wholly-owned subsidiary.  Mr. Coggan recalled
that the person prior to Mr. Fields who was running Sierra=s first rig, and then Mr. Fields,
informally asked that Southwest Royalties find industry standard information, a
drilling industry guide.  Mr. Coggan stated that Southwest Royalties did help find and
obtain a well hand industry standard handbook. 
This request occurred in 1993 and/or 1994, and he responded by ordering
handbooks out of a Penwell Catalog.  Mr. Coggan also
stated that in 1995 and/or 1996 or earlier, Southwest Royalties helped Mr.
Fields complete a personnel handbook. 
When asked whether he remembered if any of the information that
Southwest Royalties supplied or any help he gave involved the safety standards
that governed wire cables, Mr. Coggan replied, AI am sure they had that in there, yes,
sir.@  Mr. Coggan
testified that this was the extent of any services related to safety and
equipment maintenance in the field service area.  








The summary
judgment evidence also contains testimony from former Sierra safety
directors.  K.R. AButch@ Brents was
safety director for Sierra from April 1998 to April 1999.  In affidavit testimony, Mr. Brents stated that Southwest Royalties did not control or
direct Sierra=s safety
programs or operations during his tenure. 
Mr. Brents also stated that Southwest
Royalties did not furnish Sierra=s
safety manual and did not direct or control the creation, development,
implementation, or dissemination of Sierra=s
safety manual or handbooks.  Mr. Brent=s successor, Gary Crook worked as
safety director from April 1999 to October 2000.  Mr. Crook prepared a safety manual for Sierra
in May 1999.  In deposition testimony, he
recalled seeing the prior manual in Mr. Brent=s
office, but he did not know its contents. 
Mr. Crook stated that he did not look at or use the Brent manual at all
in producing the May 1999 safety manual. 
Mr. Crook did not know if Sierra had any wire rope standards for
inspection, safety, or replacement, in force or published prior to the May 1999
manual.  Mr. Crook also testified that he
had no conversations with Southwest Royalties in preparing
the safety materials nor any knowledge of what role, if any, Southwest
Royalties had played in producing prior manuals or safety handbooks.

In Issue Two, Appellants
contend that the trial court erred in granting summary judgment on the basis
that there was no evidence of a relationship between Sierra and Southwest
Royalties that would give rise to a duty of care to Appellants by Southwest
Royalties.  Appellants assert that
Southwest Royalties assumed a legal duty to Mr. Olivas
under the 1997 Service Agreement because ASouthwest
Royalties agreed for consideration to provide services to Sierra Well Service,
which included providing safety information to be incorporated in the latter=s safety policies and procedures
manual.@  We disagree.








It is clear from
the context and circumstances in this case that the 1997 Service Agreement
between Southwest Royalties and Sierra was primarily for the purpose of
securing financial and accounting services for Sierra during its transition
from a wholly-owned subsidiary to a separate entity.  While the terms of this Agreement are quite
general, the overwhelming majority of the  Service Agreement provisions are
related to financial and administrative services that Southwest Royalties would
provide to Sierra upon Sierra=s
request.  The Service Agreement contains
no express language to suggest that in entering the Service Agreement Southwest
Royalties was undertaking a duty to provide safety information for Sierra=s safety policies and procedures manual
or that Southwest Royalties would be responsible for researching industry
standards related to wire cable repair or maintenance.  Further, there is no evidence that the
services rendered by Southwest Royalties under the Service Agreement included
providing safety information or researching industry standards.  Rather, K.R. AButch@ Brents,
Sierra=s safety
director at the time of Mr. Olivas= injury, stated in affidavit testimony
that Southwest Royalties did not control or direct Sierra=s safety programs or operations during
his tenure nor did Southwest Royalties direct or control the creation,
development, implementation, or dissemination of Sierra=s
safety manual or handbooks.  








Appellants= argument for showing some evidence of
a liability claim under Section 324A rests on certain statements made by Mr. Coggan during his deposition testimony.  Mr. Coggan
testified as to two instances in which Southwest Royalties ordered safety
standard handbooks upon request and assisted in preparing a personnel
handbook.  At that time, Sierra was a
wholly-owned subsidiary of Southwest Royalties and the 1997 Service Agreement
was not in effect.  In their brief,
Appellants argue that Southwest Royalties assumed the obligation of providing
industry safety standards to Sierra, which it would have recognized as
necessary for the protection of Sierra=s
employees.  They further argue that
Southwest Royalties failed to exercise reasonable care because they failed to
provide information regarding wire cable replacement.  Even assuming that the pre-1997 instances in
which Southwest Royalties provided requested materials to Sierra are relevant
to an alleged duty assumed later on, Appellants produced no evidence to show
that Southwest Royalties failed to provide wire cable standards to Sierra.  Based on the summary judgment evidence in the
record, we conclude that Appellants failed to produce probative evidence that
Southwest Royalties assumed a duty to Appellants when Southwest Royalties
undertook to render certain services to Sierra under the 1997 Service
Agreement.  Therefore, Appellants failed
to produce evidence as to an essential element of the liability claim they asserted.  Issue Two is overruled.

Given our
disposition of Issue Two, it is not necessary to address Appellants= remaining issues.  We affirm the trial court=s judgment.

 

 

August
12, 2003

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.











[1]
Defendants Star Tool Co. and Southwest Partners L.P. were non-suited by
Appellants in the trial court and Defendant Nimrod Petroleum Inc. was severed
from this cause.





[2]
We note that on appeal, Appellants limit their theory of duty to the
contractual relationship between Southwest Royalties and Sierra at the time of
Mr. Olivas=
injury.  We also observe that Appellants
do not assert any liability claim which is based on Southwest Royalties= direct or indirect stock ownership of
Sierra nor do they assert any alter ego theory.