# Supreme Court of Texas

No. 20-0366

Elephant Insurance Company, LLC,

*Petitioner*,

v.

Lorraine Kenyon, Individually and as Executrix of the Estate of
Theodore Kenyon,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

**Argued November 30, 2021**

JUSTICE DEVINE delivered the opinion of the Court.

JUSTICE YOUNG filed a concurring opinion, in which Justice
Blacklock joined.

After an insured motorist was involved in a single-car accident,
the motorist's spouse arrived at the accident scene and began taking
photos. While the spouse was on the side of the road engaging in that
activity, he was struck by another vehicle and killed. The motorist
alleges her automobile insurer had "instructed" her to take photos; she

had relayed that instruction to her spouse, who was complying when the other driver hit him; and the insurer's negligence in issuing such an instruction proximately caused her spouse's death. The issue of first impression in this wrongful-death and survival action is whether the automobile insurer owed the motorist and her husband a duty to process a single-vehicle accident claim without requesting that the insured take photographs or to issue a safety warning along with any such request. Balancing the factors relevant to "determining the existence, scope, and elements of legal duties,"[1] we agree with the trial court that the insurer bore no such duty. We therefore reverse the court of appeals' judgment and render judgment for the insurer.

## I. Background

Lorraine Kenyon lost control of her car on a rain-slick road, striking a guardrail. No other cars were involved. The accident scared Kenyon and rendered her vehicle inoperable, but she was uninjured. Kenyon first called her husband, Theodore, and then her insurer, Elephant Insurance Company, to report the accident. A "first notice of loss" representative working at Elephant's Virginia call center took Kenyon's call. The conversation was recorded and transcribed for the record.[2]

Shortly after the call began, the recording captured part of a brief exchange between Kenyon and an unknown person that prompted

---

[1] *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 506 (Tex. 2017); *see Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) ("[T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question.").

[2] The full transcription is attached as an appendix to this opinion.

2

Kenyon to say, "Do we need to call 911? Well, I've got the insurance. Yeah. I'm not — I'm not hurt. No. Just soreness, you know, I think from the seat — from the seat belt." The recording also captured a brief exchange between Kenyon and a firefighter, who stopped to inquire about her condition.

Afterward, Kenyon raised the subject of photographs by inquiring, "Do you want us to take pictures?" The representative answered, "Yes, ma'am. Go ahead and take pictures. And — And we always recommend that you get the police involved but it's up to you whether you call them or not." A short time later, Kenyon mentioned that, before calling Elephant, she had called her husband, who was at their home, a short distance from the accident site. Immediately thereafter, the representative recapped:

> Okay. And pictures — And you said you're going to take pictures. And the vehicle is not drivable. Let me go back real quick. It does look like you have roadside assistance towing on the policy, so what I can do is, I can go ahead and transfer you over to them, that way — . . . they can help you out with getting the vehicle towed.

There was no discussion about the time, place, or manner for taking any pictures.

At some point, Theodore arrived on scene and began taking pictures. The recording does not reflect when Theodore arrived or when and how Kenyon relayed the request to take pictures.[3] Nor does the

---

[3] Kenyon's deposition testimony is no more illuminating. She recounted that before Theodore was hit, she had inquired about taking pictures and told Theodore "they need pictures."

recording suggest that the call-center employee knew Theodore was en route, on scene, or in the process of taking pictures. But while Kenyon remained on the phone with Elephant's representative, another driver lost control on the wet road; struck Theodore, who was reportedly standing off-road taking pictures; and collided with Kenyon's vehicle. The call ended with the call-center employee making a 911 call at Kenyon's request. Theodore sustained fatal injuries and died on the way to the hospital. Kenyon also suffered injuries, but they were not life-threatening.

Following this undeniably tragic event, Kenyon, individually and as executrix of her husband's estate (collectively, Kenyon), filed a wrongful-death and survival action against Elephant and the other driver. Against Elephant, she alleged several negligence theories— including ordinary negligence, negligent training and licensing,[4] negligent undertaking, and gross negligence—and claims related to Elephant's handling of her claim for uninsured/underinsured motorist (UIM) benefits. All of the negligence claims were based, in whole or part, on Kenyon's contention that Elephant's call-center employee was negligent in "instructing" her to take unnecessary photographs of a single-vehicle accident because the instruction to do so substantially increased the risk of harm to Theodore. Kenyon argued that Elephant failed to train its first-notice-of-loss representatives to instruct insureds at the scene of an auto accident "in a safe and competent manner."

---

[4] As we recently noted, we have not ruled definitively on the existence, elements, and scope of torts such as negligent training, and we are not called on to do so in this case. *See Pagayon*, 536 S.W.3d at 505.

Kenyon alleged that, due to the "special relationship" between an insurer and insured, Elephant had a general "duty to act as a reasonable and prudent insurance company" and breached that duty "when it instructed the insureds to take photographs from the scene." If such a duty did not already exist, she alleged that one arose when Elephant affirmatively acted to guide her through the post-accident claims process.

In the course of discovery, Elephant's call-center employee testified that she was trained to obtain information about the accident, who was at fault, and the existence of any injuries, as well as to encourage the insured to take photographs of the accident scene. But she was not trained to inquire about the insured's safety or to ask whether the insured was in a safe location. Even so, Kenyon testified that she did not expect Elephant's employee to provide safety guidance, that she believed she and Theodore were safe, and that if either of them had felt otherwise, they would have taken appropriate precautions.

Elephant moved for traditional and no-evidence summary judgment on all of Kenyon's claims. With respect to the negligence and gross-negligence claims, Elephant argued, among other things, that (1) Kenyon's reliance on a "special relationship" between an insurer and insured does not give rise to duties outside of the claim-processing context, (2) an insurer bears no duty to ensure an insured's safety, (3) Elephant owed no duty to ensure Theodore's safety, and (4) Kenyon could produce no evidence that Elephant "breached any duty or standard of care imposed by Texas law." Elephant further argued that the evidence conclusively negated the elements giving rise to a duty under

5

a negligent-undertaking theory and, in the alternative, that no evidence supported the elements of such a duty or the predicates to establishing gross negligence for exemplary-damages purposes.

The trial court denied summary judgment as to Kenyon's UIM claims, which are not at issue in this proceeding, but rendered judgment in Elephant's favor on all of the negligence and gross-negligence claims, concluding that the insurer "owed no duty" to the Kenyons with respect to those claims. The court granted Kenyon permission to take an interlocutory appeal of the order granting summary judgment on the negligence and gross-negligence claims, observing that (1) the portion of the order disposing of those claims involves controlling questions of law as to which there is a substantial ground for difference of opinion regarding whether Kenyon has stated viable claims against Elephant for damages arising from Theodore's death and (2) an immediate appeal of that portion of the order may materially advance termination of the litigation because those claims represent the majority of the claimed damages.[5]

Kenyon timely filed an application for a permissive interlocutory appeal and presented the controlling legal issues as whether an insurer has a duty to "exercise reasonable care in providing [post-accident] guidance so as not to increase the risk of harm to its insured," and if not,

---

[5] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(d) (providing the requisites for granting a permissive appeal of an otherwise unappealable interlocutory order).

6

whether Elephant voluntarily assumed such a duty.[6]  The court of appeals accepted the appeal,[7] and in a split decision, the panel affirmed the trial court's summary judgment.  Considering the undisputed facts and viewing the record favorably to Kenyon as the nonmovant, the panel majority conducted a balancing inquiry in determining that the insurer did not owe a duty to the Kenyons under the circumstances alleged.  The court also concluded that the negligent-undertaking claim failed because Elephant did not undertake any affirmative action for the Kenyons' protection.

On rehearing, the en banc court withdrew the panel opinion and reversed the trial court's order as to all of Kenyon's negligence and gross-negligence claims.[8]  In doing so, the appellate court labored to the conclusion that its only obligation in the permissive appeal was to ascertain whether Elephant owed any duty at all to the Kenyons.[9]

---

[6] *See id.* § 51.014(f) (stating that, to perfect a permissive interlocutory appeal, the appealing party must file an "application" with the court of appeals "not later than the 15th day after the date the trial court signs the order to be appealed" and explain why an appeal is warranted).

[7] *See id.* (authorizing the court of appeals to accept an appeal of an otherwise unappealable interlocutory order if (1) the requisites for a permissive interlocutory appeal are satisfied, (2) the trial court has granted permission to appeal the order, and (3) the appealing party has timely filed an application explaining why a permissive appeal is warranted).

[8] 628 S.W.3d 868, 878, 912 (Tex. App.—San Antonio 2020) (en banc). Kenyon also appealed the trial court's summary judgment on her statutory misrepresentation claims, but the court of appeals dismissed that portion of the appeal for want of jurisdiction because those claims were outside the scope of the permissive appeal.  *Id.* at 884.  Kenyon did not appeal the disposition of her negligence per se and negligent-failure-to-license claims.  *Id.* at 884 n.3. Accordingly, none of these claims are at issue here.

[9] *Id.* at 881-84.

7

Viewing its objective narrowly, the court stated that it either could not or would not determine whether any such duty actually applies to the facts and circumstances surrounding the occurrence in question.[10] Rather, the court treated the scope of a duty as a question of "breach" that it was neither asked nor required to decide.[11] After observing that insurers do indeed owe their insureds "a duty of good faith and fair dealing"—which is a bad-faith cause of action related to claims processing—the court concluded that this duty was not conclusively negated because the record bears some evidence that "Elephant's request or instruction that Kenyon take accident scene pictures 'has [some]thing to do with the processing [or paying] of claims'" given that the policy requires insureds to submit to Elephant "all photographs . . . the [insured] has" and provide "accident or loss information [to Elephant] as soon as practicable."[12]

The court further held that the record bears some evidence that Elephant had assumed a duty by voluntarily undertaking affirmative action for the Kenyons' benefit or protection. In the court's estimation, the summary-judgment evidence raised a fact issue that (1) "Elephant performed insurance services—'guid[ing] the insureds through the post-accident events, including beginning [Elephant's] investigation of the claim'"; (2) such services were for Kenyon's benefit or protection because the insurance policy included personal-injury-protection (PIP)

---

[10] *Id.* at 880 & 887-91.

[11] *Id.* at 882-84.

[12] *Id.* at 888 (first two alterations in original).

benefits, roadside-assistance benefits, and collision coverage;[13] (3) Kenyon had relied on Elephant's agreement to provide these benefits by complying with the request to take pictures; and (4) Elephant's performance of these insurance services "increased the risk of harm" to Kenyon.[14]

Responding to the dissents, the court asserted that the foregoing conclusions were confirmed by balancing the various factors courts usually weigh to determine whether a duty exists under the common law, holding that "under the narrow facts of this case," when an insured reports a claim, an automobile insurer has a duty to protect the insured's physical safety when providing post-accident guidance.[15] Because the trial court's summary-judgment ruling was based on the absence of any duty, the court held that summary judgment was not proper as to Kenyon's negligence, negligent-undertaking, negligent-training, and gross-negligence claims.[16]

The dissenting justices criticized the majority's adoption of a "new duty" that requires an insurer who answers a telephone call to "'exercise reasonable care in providing [post-accident] guidance so as not to increase the risk' of physical harm to the insured, including ascertaining whether the insured is physically safe before answering her questions

---

[13] *Id.* at 898.

[14] *Id.* at 891-99.

[15] *Id.* at 902-12.

[16] *Id.* at 901-02 & 912.

or permitting or encouraging her to document damage to her vehicle."[17] The dissents explained that (1) no such duty currently exists under the common law;[18] (2) the majority had interpreted, expanded, and misapplied the duty of good faith and fair dealing far beyond its recognized and logical scope;[19] (3) the majority had misapplied the balancing factors for determining whether a new duty should be recognized under the common law;[20] (4) Kenyon's negligent-undertaking claim failed as a matter of law because the record bears no evidence that Elephant undertook any actions that it knew or should have known were necessary for Kenyon's protection and Kenyon admitted she was not relying on Elephant's first-notice-of-loss representative to provide her safety advice;[21] and (5) the absence of any duty supporting a negligence claim precluded recovery on gross-negligence and negligent-training claims premised on the same conduct.[22]

Elephant's petition for review echoes the dissenting justices' concerns about the court of appeals' legal analysis.[23]

---

[17] *Id.* at 912-13 (Marion, C.J., dissenting) (alteration in original); *id.* at 918 (Martinez, J., dissenting) (joining Chief Justice Marion's dissent and concurring in her analysis).

[18] *Id.* at 912-13 (Marion, C.J., dissenting).

[19] *Id.* at 914.

[20] *Id.* at 914-16; *id.* at 918-20 (Martinez, J., dissenting).

[21] *Id.* at 916-17 (Marion, C.J., dissenting).

[22] *Id.* at 917-18.

[23] Amicus curiae American Property Casualty Insurance Association and Texas Association of Defense Counsel filed briefs supporting Elephant.

## II. Discussion

The elements of a common-law negligence claim are (1) a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach.[24] "The threshold inquiry in a negligence case is duty."[25] This inquiry encompasses several questions of law: the existence, scope, and elements of a duty.[26] Here, the central dispute and the controlling

---

[24] *See, e.g.*, *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998).

[25] *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

[26] *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 506 (Tex. 2017) (courts "balance the relevant factors in determining the existence, scope, and elements of legal duties"); *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 191-92 (Tex. 2004) ("[T]he decision whether to require a warning to ultimate users in addition to a warning to intermediaries is for us one of legal duty."); *Phillips*, 801 S.W.2d at 525 ("[T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question."); *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998) ("The foreseeability of an unreasonable risk of criminal conduct is a prerequisite to imposing a duty of care on a person who owns or controls premises to protect others on the property from the risk. Once this prerequisite is met, the parameters of the duty must still be determined. 'Foreseeability is the beginning, not the end, of the analysis in determining the extent of the duty to protect against criminal acts of third parties.'"); *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119-20 (Tex. 1976) (determining the elements giving rise to a duty under a negligent-undertaking theory); *see also In re Occidental Chem. Corp.*, 561 S.W.3d 146, 170 n.4 (Tex. 2018) (Boyd, J., dissenting) (noting that "the legal question [at issue] goes to the scope of the counties' duty, not the existence of that duty" (emphasis omitted)); *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 64 (Tex. 1997) (Hecht, J., concurring) ("It is the courts' duty to provide clarity because the existence and scope of a legal duty are questions of law." (citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983), which examined the scope of an employer's duty to control an intoxicated employee based on a balancing of factors)); *Am. Indus. Life Ins. Co. v. Ruvalcaba*, 64 S.W.3d 126, 133 n.4 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("[W]e review the trial court's determination of the existence and scope of a negligence duty *de novo*.").

issues involve the existence and scope of a duty—that is, whether Elephant owes a duty to Kenyon that applies to the factual situation presented. As we have explained, "the existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question."[27] "When a duty has not [already] been recognized in particular circumstances, the question is whether one should be."[28]

Before a duty is recognized, courts must weigh the "social, economic, and political questions and their application to the facts at hand"[29] to determine whether a duty exists and what it is.[30] The considerations that bear on those matters include "the risk, foreseeability, and likelihood of injury [weighed] against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant."[31] Additional considerations include "whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm."[32] Courts may not hold people to very general duties of exercising ordinary care in all circumstances.[33] Rather, "Texas law requires the court to be more specific, to balance the

---

[27] *Phillips*, 801 S.W.2d at 525.

[28] *Pagayon*, 536 S.W.3d at 503.

[29] *Humble Sand & Gravel*, 146 S.W.3d at 182.

[30] *Pagayon*, 536 S.W.3d at 506.

[31] *Humble Sand & Gravel*, 146 S.W.3d at 182.

[32] *Id.*

[33] *Pagayon*, 536 S.W.3d at 506.

12

relevant factors in determining the existence, scope, and elements of legal duties."[34]

Though fact issues may be involved in determining whether to impose a duty in a defined class of cases, the issue is not whether the facts show a breach of an applicable standard of care.[35] Rather, the duty inquiry involves evaluating the factual situation presented "in the broader context of similarly situated actors."[36] Some of the balancing factors—like risk and foreseeability—may involve questions of fact that cannot be determined as a matter of law, but "such cases are unusual."[37] More often, "the material facts are either undisputed or can be viewed in the light required by the procedural posture of the case."[38] In this case, the facts surrounding the event in question are largely undisputed and, to the extent they are not, can be viewed, as the summary-judgment standard requires, in the light most favorable to Kenyon.[39]

In confronting the duty question presented in this case, the court of appeals focused on the existence of some duty without considering the parameters or applicability of the duty to the circumstances alleged. Compounding the error, the court artificially constricted the scope of

---

[34] *Id.*

[35] *Id.* at 504.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017) (viewing all disputed evidence favorably to the summary-judgment nonmovant and indulging all reasonable inferences and resolving all doubts favorably to the nonmovant).

13

appellate review, suggesting that permissive interlocutory appeals are substantively different because the procedural vehicle for pursuing one is different than other types of appeals.[40]  Our opinion in *Sabre Travel International, Ltd. v. Deutsche Lufthansa AG*[41] is clear in placing a properly certified interlocutory appeal on equal footing with other appeals with respect to disposition on the merits; nonetheless, we elaborate here.

## A. Scope of Appeal

While appeals are often taken only from a final judgment, "necessity" and "public policy dictates" have "driven the Legislature to enact a comprehensive interlocutory appeals statute to allow certain appeals before final judgment."[42]  One such exception to the final-judgment rule is the permissive interlocutory appeal statute in Section 51.014(d) and (f) of the Texas Civil Practice and Remedies Code. In enacting this statute, the Legislature "was driven by the public policy of ensuring the efficient resolution of civil suits . . . and making the judicial system more accessible, more efficient, and less costly to all

---

[40] 628 S.W.3d 868, 881-83 (Tex. App.—San Antonio 2020).

[41] 567 S.W.3d 725, 730, 731 (Tex. 2019).

[42] *Id.*; *see Dall. Symphony Ass'n, Inc. v. Reyes*, 571 S.W.3d 753, 758-59 (Tex. 2019) (observing that the ever-expanding categories of interlocutory appeals have made those types of appeals more of the rule than the exception).

taxpayers."[43]  Such an appeal is authorized only with the trial court's permission and only when:

> (1) the order to be appealed involves a controlling question of law as to which there is a substantial ground for difference of opinion; and
>
> (2) an immediate appeal from the order may materially advance the ultimate termination of the litigation.[44]

When these requirements are satisfied, granting a permissive appeal spares litigants and courts "the inevitable inefficiencies of the final judgment rule in favor of early, efficient resolution of controlling, uncertain issues of law that are important to the outcome of the litigation."[45]

Unlike mandatory interlocutory appeals,[46] courts of appeals have discretion to accept an interlocutory appeal certified by the trial court.[47] In this case, the requirements for taking a permissive interlocutory appeal have been satisfied, and the court of appeals exercised its discretion to accept the appeal, as has this Court.[48]  But in deciding the case, the appeals court took a disconcertingly cramped view of its jurisdiction over the appeal and pointedly constrained its principal

---

[43] *Sabre Travel*, 567 S.W.3d at 736 (discussing TEX. CIV. PRAC. & REM. CODE § 51.014(d), (f)).

[44] TEX. CIV. PRAC. & REM. CODE § 51.014(d).

[45] *Sabre Travel*, 567 S.W.3d at 732.

[46] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(1)-(15).

[47] *Id.* § 51.014(f); *see Sabre Travel*, 567 S.W.3d at 732.

[48] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(d), (f).

analysis to only a portion of the duty inquiry—whether any duty exists at all.[49] While it is true that the issue in this interlocutory appeal concerns the duty element of a negligence claim, the scope of that inquiry is not as narrow as the court of appeals framed it. The question is not only whether a duty exists in the abstract but also whether the duty is applicable to or fairly implicated by the facts and circumstances presented.

When an appellate court—this or any other—accepts a permissive interlocutory appeal, the court should do what the Legislature has authorized and "address the merits of the legal issues certified."[50] In doing so, permissive appeals are resolved according to the same principles as any other appeal, including addressing all fairly included subsidiary issues and ancillary issues pertinent to resolving the controlling legal issue.[51] The permissive interlocutory appeal statute expressly allows an appeal from *an order* that is otherwise unappealable if "*the order to be appealed* involves a controlling question of law" and if "an immediate appeal from *the order* may materially advance the ultimate termination of the litigation."[52] While "involve[ment]" of a controlling legal issue is essential to securing a permissive appeal, the statute plainly provides that it is *the order* (or, as the case may be, the

---

[49] 628 S.W.3d 868, 881-84, 886-88 (Tex. App.—San Antonio 2020) (en banc).

[50] *See Sabre Travel*, 567 S.W.3d at 733.

[51] *See* TEX. R. APP. P. 38.1, 53.2.

[52] TEX. CIV. PRAC. & REM. CODE § 51.014(d) (emphases added).

16

relevant portion of the order) that is on appeal,[53] and the rules of appellate procedure preclude a strict construction of issues presented on appeal.[54] In the context of a permissive interlocutory appeal, giving the parties half a loaf is not better than giving them nothing; it is worse than nothing.[55] It is less efficient and more costly and thwarts the prudential and salutary purpose of the power the Legislature has granted.

Fully addressing the legal issues presented here and preserved below, as the Legislature intended, we hold that Kenyon's negligence claims fail for want of an *applicable* legal duty. Because the existence, scope, and elements of a legal duty are legal questions subject to *de novo* review, we need not endeavor to unwind the Gordian Knot the court of appeals constructed in reaching the contrary conclusion. We nonetheless start with a brief discussion of the insurer's duty of good faith and fair dealing, which the court of appeals latched onto *sua sponte* based on (1) Kenyon's allegation that a "special relationship" between an insurer and insured gives rise to a duty of care and (2) Elephant's concession that the nature of the insurance relationship gives rise to a special relationship that imposes a duty on insurers to act fairly and in

---

[53] *Id.*; *see Dall. Symphony Ass'n, Inc. v. Reyes*, 571 S.W.3d 753, 759 (Tex. 2019) (stating that in construing an interlocutory-appeal statute, "the real goal is simply a 'fair' reading of the language," which means a reading that "give[s] effect to all its provisions").

[54] *See* TEX. R. APP. P. 38.1(f), 53.2(f).

[55] *Cf. Coastal Corp. v. Garza*, 979 S.W.2d 318, 322-26 (Tex. 1998) (Hecht, J., dissenting) ("[I]t is a time-honored maxim of the Anglo–American common-law tradition that a court possessed of jurisdiction generally must exercise it." (alteration in original) (quoting *Ohio v. Wyandotte Chems. Corp.*, 401 U.S. 493, 496-97 (1971))).

17

good faith. Even acknowledging those circumstances to be true, we agree with Elephant that the duty of good faith and fair dealing does not encompass the negligence claims alleged here.

## B. Duty of Good Faith and Fair Dealing

Kenyon's live pleading states that, "[d]ue to the special relationship between [Elephant] and [Kenyon] resulting from the insurer/insured relationship, [Elephant] owed [Kenyon] [a] duty to act as a reasonable and prudent insurance company when the insureds contacted [Elephant] regarding the claim arising from the single-vehicle accident." As Elephant acknowledges, "[i]n the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims."[56] This is so because "[a]n insurance company has exclusive control over the evaluation, processing and denial of claims."[57]

In *Arnold v. National County Mutual Fire Insurance Co.*, we explained that, absent a duty of good faith and fair dealing, insurers could "arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed."[58] "For these reasons a duty is imposed that '[an] indemnity company is held to that degree of care and diligence which a man of ordinary care and prudence would

---

[56] *See Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987).

[57] *Id.*

[58] *Id.*

18

exercise in the management of his own business,'" and "[a] cause of action for breach of the duty of good faith and fair dealing is stated when it is alleged that there is no reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay."[59]

The duty Kenyon urges the Court to adopt here bears no resemblance to the duty of good faith and fair dealing, which *Arnold* and its progeny have applied only to issues of timeliness and "unscrupulous" conduct in the investigation, processing, and payment of claims.[60] Kenyon's negligence and gross-negligence claims against Elephant for lack of appropriate "guidance" are not based on "unequal bargaining power," "the nature of insurance contracts," "tak[ing] advantage" of the

[59] *Id.* (quoting *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 548 (Tex. Comm'n App.1929, holding approved)).

[60] *See id.*; *see also, e.g.*, *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 340 (Tex. 1995) (holding that an insurer does not breach the duty of good faith and fair dealing if it denies a claim for an invalid reason when there was, at the time, a valid reason for denial because breach of the duty "requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits"); *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 283 (Tex. 1994) (holding that the duty of good faith and fair dealing extends to an insurer's cancellation of a policy because "[t]he insurer's ability to unilaterally cancel an insurance policy and the insured's inability to prevent cancellation demonstrates a great disparity in bargaining power between the two parties"); *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex. 1993) (holding that bad faith focuses on the reasonableness of the insurer's conduct in rejecting a claim); *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990) (describing the duty of good faith and fair dealing as focused on "the processing and payment of claims"); *Viles v. Sec. Nat'l Ins. Co.*, 788 S.W.2d 566, 568 (Tex. 1990) (holding that the special relationship in the insurance context imposes a "duty to investigate claims thoroughly and in good faith, and to deny those claims only after an investigation reveals there is a reasonable basis to do so").

insured's misfortunes, "bargaining for settlement or [resolution of] claims," or the deprivation of any contractually assured benefit.[61] Neither the animating rationale for the duty of good faith and fair dealing nor any precedent supports extending its scope to encompass post-accident guidance inquiring about, ensuring, or protecting an insured's safety. In short, while an insurer owes an insured a duty of good faith and fair dealing, that duty is not applicable to the conduct alleged here.

## C. *Phillips* Factors

To determine whether a duty exists and what its parameters are, we apply what are commonly called the "*Phillips* factors."[62] This inquiry requires us to "weigh[] the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant."[63] In making this assessment, we also consider "whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm."[64] Here,

---

[61] *Union Bankers Ins.*, 889 S.W.2d at 283.

[62] *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004); *see Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 504 (Tex. 2017); *Praesel v. Johnson*, 967 S.W.2d 391, 397-98 (Tex. 1998); *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

[63] *Humble Sand & Gravel*, 146 S.W.3d at 182.

[64] *Praesel*, 967 S.W.2d at 397-98.

the relevant risk of harm is a car running over a pedestrian standing adjacent to a roadway taking pictures of an accident scene.

We first note that insurers generally have no control over third-party motorists, and Kenyon does not contend that Elephant had control over the driver who struck Theodore. Nor is there any evidence or allegation that Elephant was responsible for Theodore's presence at the scene of the accident. Second, foreseeability of the risk of harm is the "'foremost and dominant consideration' in the duty analysis" because "there is neither a legal nor moral obligation to guard against that which cannot be foreseen[.]"[65] Foreseeability of the "general danger" is an essential part of the inquiry, but we must also evaluate the foreseeability of the specific danger—"whether the injury to the particular plaintiff or one similarly situated could be anticipated."[66] "Harm is foreseeable if a person of ordinary intelligence should have anticipated the danger created by an act or omission."[67]

The general danger of getting hit by a car may be reasonably foreseeable if an insured is "instructed" to take pictures at the scene of an automobile accident or if such a request is issued without also warning the insured to "be careful" or without first inquiring whether the insured believes it is safe to do so. But that is true only because the

---

[65] *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 34 (Tex. 2002) (quoting *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987)); *Hous. Lighting & Power Co. v. Brooks*, 336 S.W.2d 603, 606 (Tex. 1960).

[66] *Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018); *see Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 656-58 (Tex. 1999) (plurality op.); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 551 (Tex. 1985).

[67] *Bos*, 556 S.W.3d at 303.

21

danger of getting hit by a car when standing on the side of a road exists regardless of the activity being undertaken at the time and regardless of the care one is taking for one's own safety. The danger is no more or less foreseeable because photographs are being taken. The likelihood of injury was no greater than if Kenyon had exited her vehicle to depart the scene or if she was standing on the side of the road talking to a tow-truck driver or a first responder.

The risk of harm to a third party not involved in the accident who arrives on scene at some later point in time, like Theodore, is not reasonably foreseeable.[68] "Foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury."[69] "[Even if] the insurer encourages the insured to '[g]o ahead and take pictures,' there is no reason for an insurer to anticipate that the insured will do so in dangerous conditions or circumstances."[70]

To the extent the risk of harm was foreseeable to someone in Elephant's position, it was equally foreseeable—if not more so—to someone in Kenyon's or Theodore's position, both of whom were better situated to contemporaneously assess their physical safety and act

---

[68] *See Mellon Mortg.*, 5 S.W.3d at 656-58 (plurality op.) (holding that the risk of harm was not foreseeable even though violent criminal conduct was generally foreseeable because the defendant property owner could not have reasonably foreseen that unauthorized access to its parking garage would lead to an unrelated third-party's injuries).

[69] *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex. 1995).

[70] 628 S.W.3d 868, 915 (Tex. App.—San Antonio 2020) (Marion, C.J., dissenting).

accordingly. Time and again we have declined to impose a duty to warn about open and obvious conditions, even when the actor has control over the premises or the injured party.

In *Austin v. Kroger Texas, LP*, for example, we held that the employer's premises-liability duty to its employee did not include the duty to protect or warn against an open and obvious danger because the employee was in a better position to discover the danger.[71] The employer in that case had greater control than Elephant had here. Elephant's employee was not present at the scene, and her only connection to what occurred was answering a long-distance phone call. Kenyon testified that she felt safe and would have taken appropriate action if she believed that she or her husband were in danger. While "[a]n insurance company has exclusive control over the evaluation, processing[,] and denial of claims," "exclusive control" does not translate to potential liability for everything that happens during the claims process.[72] Even if Elephant's employee had some real or perceived measure of control at the time, she did not have a duty to warn of obvious dangers because Kenyon and Theodore had superior knowledge of the conditions and the best opportunity to avoid the harm. Any benefit of imposing a duty to warn or inquiring about the insured's safety is negligible at best. Ultimately, the people at the scene of an accident can

[71] 465 S.W.3d 193, 217 (Tex. 2015).

[72] *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987).

reasonably be expected to take responsibility for their own safety even without being asked or told to do so.[73]

Kenyon nonetheless asserts that the imposition of a duty is warranted because the burden on insurers to refrain from requesting accident-scene photos or of doing so only with a safety admonishment is so slight in comparison to the magnitude of potential harm. But the consequence of placing the burden on the insurer is not limited to how it would be obliged to act under a particular set of circumstances; it also includes the burden of liability for acts of third parties beyond its control.

Weighing the relevant factors, we decline to recognize the duty Kenyon proposes. We turn now to Kenyon's alternative argument that Elephant owed a duty under a negligent-undertaking theory.

### D. Negligent Undertaking

"Texas law imposes no general duty to 'become [a] good Samaritan.'"[74] Nonetheless, we have recognized that a duty arises when the defendant undertakes, gratuitously or for consideration, to render services that it knows or should know are "necessary for the protection of the other's person or things" and either (1) the failure to exercise reasonable care increases the risk of physical harm or (2) harm results

---

[73] *See, e.g.*, RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 51 cmt. a (AM. L. INST. 2012) (presuming that those in a better position to understand the condition will take reasonable measures to protect themselves against known risks).

[74] *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) (alteration in original).

because of the other's reliance on the undertaking.[75] A voluntary undertaking gives rise to liability for physical harm if the actor fails to exercise reasonable care in performing the undertaking.[76] "The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist."[77]

Kenyon's negligent-undertaking theory fails as a matter of law for numerous reasons. First, answering a phone call and guiding an

---

[75] *Id.* at 837-38. The court of appeals rewrote the first element as including any undertaking for the plaintiff's "benefit," citing a court of appeals opinion that uses that term in a summary description of the negligent-undertaking theory but which then goes on to state the elements precisely as we do here and in our precedent. 628 S.W.3d 868, 892 (Tex. App.—San Antonio 2020) (en banc) (citing *Midwest Emps. Cas. Co. ex rel. English v. Harpole*, 293 S.W.3d 770, 777-78 (Tex. App.—San Antonio 2009, no pet.)). Although the term "benefit" has appeared in precedent generally describing the theory, we have not articulated the duty elements in the way the court of appeals did in this case. Rather, as we have set forth the elements, only an action "necessary for the *protection* of the [plaintiff's] person or things" meets the threshold requirement for imposing a duty under a negligent-undertaking theory. *See, e.g.*, *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119-20 (Tex. 1976) (noting that the plaintiff, who complained that the defendant had failed to fulfill a promise to secure casualty insurance for the plaintiff's property, was relying on a "theory of recovery . . . based on the rule that one who voluntarily undertakes an affirmative course of action for the *benefit* of another has a duty to exercise reasonable care [so] that the other's person or property *will not be injured thereby*" and listing the required element as an action "necessary for the protection" of the person or property (emphases added)). We have not held that a duty arises if the plaintiff would merely "benefit" in some way from the undertaking; instead, in describing the theory, we have (at best) generally equated "benefit" with "protection."

[76] *Torrington*, 46 S.W.3d at 838 (quoting RESTATEMENT (SECOND) OF TORTS § 323 (AM. L. INST. 1965)).

[77] *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013).

insured through the initial steps of the insurance claims process is not an action "necessary" to "protect" the insureds or their property from "harm."[78]  Nor is an instruction to take photographs documenting existing damage "necessary" to "protect" person or property from "harm."  Further, Kenyon does not allege, and the record does not contain any evidence, that Elephant's employee undertook to guide the Kenyons through the process of taking photographs—the activity Kenyon alleges increased the risk of physical harm.  For instance, Kenyon does not contend (and the record does not contain any evidence) that Elephant's employee undertook to direct her or Theodore as to when and how to take any pictures.  Elephant's employee also did not offer Kenyon or Theodore any safety advice, and Kenyon testified that she did not request any safety advice nor rely on Elephant's employee to provide it.[79]  Finally, not giving a safety warning is an omission, not an undertaking.[80]  In short, neither Elephant nor its call-center employee

---

[78] *Cf. Guillory v. Seaton, LLC*, 470 S.W.3d 237, 242 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (holding that "duties largely focus[ed] on taking care of billing and other routine administrative matters" were not "for the benefit or protection of any third parties").

[79] *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396-97 (Tex. 1991) (observing that a party cannot rely on information that was never communicated).

[80] *Id.* (holding a negligent-undertaking claim failed because the defendant did not undertake "an affirmative course of action"); *Colonial Sav. Ass'n*, 544 S.W.2d at 119 (stating an undertaking requires "an affirmative course of action"); *see Knife River Corp.–S. v. Hinojosa*, 438 S.W.3d 625, 631-32 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Thornton v. Henkels & McCoy, Inc.*, No. 13-12-00585-CV, 2013 WL 5676026, at *3 (Tex. App.—Corpus Christi–Edinburg Oct. 17, 2013, no pet.) (mem. op.) (holding that the defendant, who failed to repair a sagging cable line, was not liable for negligent

undertook necessary protective action, and Kenyon did not detrimentally rely on anything Elephant's employee said (or did not say) with regard to ensuring the safety of person or property.

The court of appeals sought to leverage various provisions of the insurance policy to satisfy the protection prong, noting that roadside assistance and collision coverage "benefit" the insured and emphasizing that protection is included in the name "Personal Injury Protection" benefits.[81] While such contract benefits are certainly helpful and desirable to insureds, it is difficult to conceive how they are essential protective actions. It is even harder to fathom how undertaking to provide them could or did "increase the risk of harm." Nor is there any evidence indicating that the Kenyons detrimentally relied on those promises or even an allegation that Elephant failed to deliver on any of them. Because neither Elephant nor its call-center employee engaged in an affirmative course of action necessary for the protection of the Kenyons' person or property, there is no cause of action for negligent undertaking.

## III. Conclusion

For the foregoing reasons, Elephant did not owe a duty applicable to the circumstance alleged, and the trial court properly granted summary judgment on Kenyon's negligence, negligent-undertaking, negligent-training, and gross-negligence theories. We therefore reverse

---

undertaking because the claim requires an "affirmative course of action" and cannot be predicated upon an alleged negligent omission or failure to act) (citing *Coastal Corp. v. Torres*, 133 S.W.3d 776, 780-81 (Tex. App.—Corpus Christi–Edinburg 2004, pet. denied)).

[81] 628 S.W.3d at 893.

the court of appeals' judgment and render judgment that Kenyon take nothing on those claims.

_____
John P. Devine
Justice

**OPINION DELIVERED:** April 22, 2022

# APPENDIX

(Statement Begins)

Elephant: Loss Reporting Unit. This is ***** speaking. How may I help you?

Kenyon: Hi, ******. My name is Lorraine Kenyon, K-E-N-Y-O-N, and I've just slid off the road and hit a hill.

Elephant: Okay. What's the Elephant Policy Number and I can get a claim number going for you?

Kenyon: [policy number omitted].

Elephant: Okay. So the call will be recorded. I'm just going to ask a few questions to get information we need.

Kenyon: Okay.

Elephant: What time was it that this happened?

Kenyon: It just happened — I guess 2:00 or — two o'clock. (Speaking to someone else) No. Do we need to call 911? Well, I've got the insurance. Yeah. I'm not — I'm not hurt. No. Just soreness, you know, I think from the seat — from the seat belt.

Elephant: And can you confirm the email and mailing address?

Kenyon: [address omitted]

Elephant: And a good contact number for you?

Kenyon: [telephone number omitted]

Elephant: Okay. And is this a cell phone?

Kenyon: Just — Just a second. (Speaking to someone else) No. Thank you very much for caring. All right. All right. I'm sorry. That was — the Fire Department stopped by.

Elephant: Okay. That's fine.

Kenyon: Uh-huh. And do you have another question now?

Elephant: What cell phone provider do you have?

Kenyon: AT&T.

Elephant: AT&T? Okay. And which vehicle was this?

Kenyon: It's the 2 — 2006 Ford Ranger.

Elephant: Okay. And so how did the incident happen?

Kenyon: I was coming around the — a bend when — it's raining here and it's really wet, and the car started to slide and it spun and I hit a — a hill.

Elephant: Okay.

Kenyon: Do you want us to take pictures?

Elephant: Yes, ma'am. Go ahead and take pictures. And — And we always recommend that you get the police involved but it's up to you whether you call them or not. Is your vehicle drivable?

Kenyon: No, it's not.

Elephant: Okay. And what type of damages to the vehicle?

Kenyon: Well, there's a busted wheel, lots of scrapes and dents, because it did hit the side of a hill.

Elephant: Yes, ma'am.

Kenyon: And the — one bumper's off and the front bumper fell off.

Elephant: Okay. And are you okay? Any injuries?

Kenyon: No injuries.

Elephant: No?

Kenyon: Just scared and a little sore.

Elephant: I don't blame you. Well, I hope the soreness goes away. I'm — I'll note that you're sore —

Kenyon: Uh-huh.

Elephant:— just so that the adjuster can follow up with that. What road was this?

Kenyon: It's Babcock.

[spelling and location of the road omitted]

Kenyon: I think I'm less than five miles away from my home.

Elephant: Okay. Yeah. They — They say, like, a lot of times, accidents happen within five miles —

Kenyon: Uh-huh.

Elephant: — of the home.

Kenyon: Uh-huh.

Elephant: Well, again, I'm really sorry about your incident. Let me see. Do you know who's towing the vehicle yet?

Kenyon: No. No. You — You're the first call I made. Well, I made a call to my husband, who was home, thank God, and then you —

Elephant: Okay.

Kenyon: — you're my second call.

Elephant: Okay. And pictures — And you said you're going to take pictures. And the vehicle is not drivable. Let me go back real quick. It does look like you have roadside assistance towing on the policy, so what I can do is, I can go ahead and transfer you over to them, that way —

Kenyon: Uh-huh.

Elephant: — they can help you out with getting the vehicle towed.

Kenyon: Okay. And — All right. You said you'd prefer that we do call the police?

Elephant: We do always recommend that you call the police just in case; that way, they know that there was an incident. I don't know if they're going to come out because you're saying that there's really no injuries or no property damage —

Kenyon: No.

Elephant: — or anything.

Kenyon: Well, the guardrail, it probably saved my life. It's a little bent.

Elephant: Oh, okay. Well, if there is property damage, I would definitely recommend calling because you would end up being liable for that guardrail.

Kenyon: Okay.

Elephant: Yeah.

Kenyon: I will.

Elephant: So go ahead and give them a call.

Kenyon: All right.

Elephant: And is there anything else I can assist you with at this time?

Kenyon: No. I've never had an accident.

Elephant: Uh-huh.

Kenyon: So when I dial 911 — Is that what I dial?

Elephant: I'm not sure what — You can always dial them and then see if they're the ones that you need to actually talk to or if they're going to give you a nonemergency —

Kenyon: Ted — (Screaming)

Elephant: Hello, ma'am.

Kenyon: (Screaming)

Elephant: Ma'am, are you okay?

[Kenyon screaming]

Elephant: Ma'am? Ma'am?

Kenyon: Oh, my God. Please dial 911 and get help. They've just run over my husband. The same thing happened to another car.

Elephant: Okay, ma'am. I'm going to call 911 now. Okay? I'm calling 911.

Kenyon: Okay.

Elephant: Okay.

Kenyon: Okay.

(Statement Concluded)